Al PINEIRO, Richard Brooks, and Leonard Beaumont, on behalf of themselves and others similarly situated, Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, as Trustee of the Pan American World Airways, Inc., Cooperative Retirement Income Plan, Defendant.

No. 96 Civ.7392 GEL.

United States District Court, S.D. New York.

Aug. 26, 2003.

Harvey Katz, Brown Rudnick Berlack Israels LLP, New York, N.Y. (John P. Biedermann and Adam B. Cantor, on the brief), for Plaintiffs Al Pineiro, Richard Brooks, and Leonard Beaumont.

Charles L. Finke, Assistant General Counsel, Pension Benefit Guaranty Corporation, Washington, DC (James J. Keightley, General Counsel, and Jeffrey B. Cohen, Karen L. Morris, Shannon Novey, Joseph Krettek, and Virginia Neiswender, Pension Benefit Guaranty Corporation, Washington, DC; and Lewis R. Clayton, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, on the brief), for Defendant Pension Benefit Guaranty Corporation.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs Al Pineiro, Richard Brooks, and Leonard Beaumont (collectively, "plaintiffs")[1] are participants in the Cooperative Retirement Income Plan (the "Plan") that was maintained by Pan American World Airways ("Pan Am") until it was terminated in 1991 as a result of Pan Am's bankruptcy. They bring this action against defendant Pension Benefit Guaranty Corporation ("defendant" or "PBGC"), alleging that, after it was appointed to serve as trustee for the Plan and to oversee its termination, it breached its fiduciary duty to plaintiffs by taking a number of actions that were not in their best interests, and by failing to act with due care. Plaintiffs bring this suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., seeking removal of PBGC as trustee and other equitable relief, and under the Administrative Procedure Act, 5 U.S.C. § 706(1), seeking an order compelling PBGC to complete its process of issuing benefit determinations to Plan participants. Both parties now move for summary judgment. For the reasons discussed below, both motions will be granted in part and denied in part.

## BACKGROUND

### I. The Statutory Framework

ERISA was enacted in 1974 to regulate the nation's employee retirement plans, after Congress concluded that "the continued well-being and security of millions of employees and their dependents are directly affected by these plans; [and] that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." 29 U.S.C. § 1001(a). Thus, in addition to establishing the standards for ongoing pension plans, ERISA regulates the process by which plans are terminated, in order to ensure that beneficiaries of terminated plans receive the benefits to which they are entitled. To this end, Title IV of

---

1. Although plaintiffs filed this action as a putative class action, they no longer seek class certification. (Def. Mem. 12 n. 5.)

ERISA, which governs plans subject to termination, provides that PBGC, a wholly-owned government corporation, will insure certain benefits provided by all employer-sponsored defined benefit plans, so that employees will receive them even when the plan itself does not have enough assets to cover its benefit liabilities.[2] *PBGC v. LTV Corp.*, 496 U.S. 633, 636–37, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

When an employer is no longer financially able to sponsor its retirement plan, PBGC may apply to a court for a decree of termination, in order to prevent the continued accrual of benefits from exponentially increasing PBGC's liability for insured benefits. 29 U.S.C. §§ 1341, 1342(a), (c). When the court finds that a plan must be terminated, Title IV mandates that the court appoint a trustee "to terminate" the plan, and to replace the plan administrator, which oversaw the plan while it was ongoing. *Id.* § 1342(c). In practice, PBGC has always applied to be appointed the trustee of terminated plans, and courts have invariably granted its application. *LTV Corp.*, 496 U.S. at 637, 110 S.Ct. 2668. The trustee is given a number of powers that, combined, allow it to invest or liquidate plan assets, pay benefits, litigate, and generally perform any necessary task in administering the plan. *Id.* § 1342(d).

The trustee is a fiduciary within the meaning of ERISA, *id.* § 1342(d)(3); *id.* § 1002(21), and therefore owes the plan and its beneficiaries duties of care and loyalty. The trustee must exercise its various powers for the exclusive purpose of providing benefits to participants and their beneficiaries, with the "care, skill, pru-

dence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity ... would use." *Id.* § 1104(a)(1)(A)(i), (B). In addition, the trustee is given the same duties given to Chapter 7 bankruptcy trustees, *id.* § 1342(d)(3), including "clos[ing] such estate as expeditiously as is compatible with the best interests of the parties in interest," and "furnish[ing] such information concerning the estate and the estate's administration as is requested by a party in interest," 11 U.S.C. § 704. The trustee's fiduciary duties are not absolute, however. Since terminating a plan usually involves allocating assets that are insufficient to cover the plan's benefit obligations, the trustee is explicitly authorized to take a number of actions that might otherwise violate its fiduciary duties, such as recovering benefits paid to participants shortly before the plan was terminated, 29 U.S.C. § 1345(a), and limiting the payment of benefits to guaranteed benefits, *id.* § 1342(d)(1)(A)(iv).

When the court issues a decree of termination, it sets a "termination date" as the date on which all benefits under the plan cease to accrue. *Id.* § 1348. Thereafter, the trustee notifies all plan participants and employers involved in the plan that it will be terminated. *Id.* § 1342(d)(2). As necessary, the trustee may recover debts to the plan, including benefit overpayments, and may liquidate the plan's assets. *Id.* § 1342(d)(1)(B). Then the "plan administrator" (in practice, the trustee) must allocate the plan's existing assets among those entitled to benefits, in the priority specified by § 1344(a).[3] This may involve

---

**2.** Defined benefit plans are those that pay employees, upon retirement, fixed benefits under a formula based on various factors, such as final salary and the number of years that the employee has worked for the employer. *See* 29 U.S.C. § 1321.

**3.** Although the statute provides that the "plan administrator" has this responsibility, in

practice it is the trustee who performs this function, as the plan administrator is no longer responsible for overseeing the plan after the appointment of the trustee. 29 U.S.C. § 1342(c); *id.* § 1342(d)(1)(A)(i) (giving the trustee the power to do any act that Title IV authorizes the plan administrator to do). Thus, PBGC customarily performs this func-

undertaking an intensive review of the plan documents, auditing its assets, and determining actuarial values in order to calculate the amount of benefits to which each participant is entitled under the plan. To assist in the calculations, PBGC and the plan administrator are required to provide a variety of plan information to the trustee. *Id.* § 1346. If the plan's current assets are insufficient to cover its liabilities—in other words, if the plan is underfunded—PBGC, as the guarantor of pension benefits, uses its own funds to pay those benefits that are "nonforfeitable" because participants' entitlement to them has vested by the date of termination. *LTV Corp.,* 496 U.S. at 637, 110 S.Ct. 2668. The process of determining which benefits are insured by PBGC can itself be complex, as PBGC must determine which benefits are nonforfeitable under the terms of the plan, and are not subject to the lengthy list of exceptions enumerated in § 1322(b). To this end, PBGC has promulgated a number of regulations that interpret the relevant statutory provisions and specify what types of benefits are guaranteed. *See* 29 C.F.R. pt. 4022. Because PBGC has always had itself appointed trustee of the plans it seeks to terminate, it must fulfill all of the functions of both trustee and guarantor with respect to all plans subject to termination.

The termination framework ensures that those who are already receiving benefits at the time of the plan's termination continue to receive them, and that those who have earned benefits receive some proportion of what they were expecting. *LTV Corp.,* 496 U.S. at 636–37, 110 S.Ct. 2668. At the same time, however, the termination of an underfunded plan inevitably creates hardship for plan beneficiaries, as the termination often occurs concurrently with the employer's bankruptcy and the loss of all of its employees' jobs, and only limited

benefits will be guaranteed and paid by PBGC. Moreover, plans involving thousands of participants necessarily require extended research into plan documents and practice, and the actuarial calculations and determinations as to whether a particular participant's benefits are guaranteed can take years, subjecting the participants to financial uncertainty even as they approach the age at which they expected to retire.

## II. *Pan Am's Retirement Plan*

The following paragraphs summarize the facts asserted by the parties, indicating the areas in which disputes exist.

Plaintiffs were employed as Pan Am ground personnel until they were involuntarily terminated on December 4, 1991, as a result of Pan Am's bankruptcy and liquidation. (Pl.Mem.7.) All three had worked for Pan Am for at least 25 years when their jobs disappeared, and all were a few years short of 55, the age at which they would have become eligible for subsidized early retirement benefits. (Pl.Mem.7–8; Am. Compl. ¶¶ 8–10.) As employees, they were participants in Pan Am's Cooperative Retirement Income Plan (the "Plan"), a defined benefit plan governed by ERISA. The plan was sponsored and administered by Pan Am, and covered over 39,000 employees. (Def.Mem.3.) Beginning in the 1980s, Pan Am's increasing financial difficulties led it to seek, and obtain, a series of minimum funding waivers that allowed it to contribute less to the Plan that otherwise required by law. (Katz Aff. Ex. 37 at 4.) By 1991, the Plan was so severely underfunded that PBGC instituted proceedings to terminate it, pursuant to 29 U.S.C. § 1342(c), on the grounds that if the plan were allowed to continue, PBGC would have to "disburse substantial sums in order to provide plan benefits to plan

tion. (Def.Mem.7.) *See LTV Corp.,* 496 U.S. at 637, 110 S.Ct. 2668.

beneficiaries." *In re Pan Am. World Airways, Inc., Cooperative Retirement Income Plan,* 777 F.Supp. 1179, 1181 (S.D.N.Y.1991). On November 25, 1991, this Court (the Hon. Michael B. Mukasey, U.S.D.J.) ordered the Plan terminated as of July 31, 1991, the date at which Pan Am employees had constructive notice of the termination. *Id.* Pan Am and PBGC later agreed that PBGC should be appointed as trustee to terminate the Plan. (Def.Ex. 15.)[4]

Upon termination, PBGC began the process of recovering and valuing the Plan's assets, receiving $110 million from the Pan Am bankruptcy estate in settlement of its claims in 1994. (Def. R. 56.1 Statement ¶ 29.) The process of valuation was complete by 1996. (*Id.*) At the same time, PBGC collected and audited participant data, an endeavor that was hindered by Pan Am's allegedly "mislabeled and insufficient" records. (Def.Mem.9; Def. R. 56.1 Statement ¶ 23.) Thus, PBGC was forced to review every individual personnel file, collect and catalog missing information, and reconcile Pan Am's information with that submitted by participants. PBGC completed its audit for participants who it had determined were not eligible for benefits because they were not Plan participants by early 1995, but did not complete its audit of non-vested participants until over a year later. (Def. R. 56.1 Statement ¶¶ 32, 35.) It finally produced a master database of all participant data in August 1997. (*Id.* ¶ 38.)

Meanwhile, after valuing the Plan's existing assets, PBGC began allocating the assets according to categories of benefit liabilities, as provided in § 1344. (*Id.* ¶¶ 29, 42.) This involved locating and collecting Plan documents in New York, New Jersey, and Florida, and auditing them to determine which ones actually governed the Plan. (*Id.* ¶ 41.) By March 1998, PBGC had finalized its collection of Plan documents, which consisted of 102 documents totaling 2,600 pages. (*Id.*)

Even before it had finished collecting the Plan documents, PBGC had begun to issue benefit determination letters ("BDLs"), as it determined participants' entitlement to benefits under the Plan and whether their benefits were guaranteed. (*Id.* ¶¶ 32–34.) In 1995, PBGC issued roughly 18,000 BDLs to Pan Am employees who were not entitled to benefits because they were not participants in the Plan, as well as those participants whose entitlements had not yet vested at the time of termination. (Def. R. 56.1 ¶ 52.) By May 1999, PBGC had issued all of the BDLs for which it had sufficient information to make a determination. As of April 2003, only 205 determinations remained to be made, 127 of which involved missing participants,[5] and 78 of which involved recently discovered participants. (*Id.* ¶ 54.) Of the 49,459 BDLs issued, 4,161 were appealed, and PBGC's Appeals Board has completed its review of all but 22 of the appeals. (Def.Mem.28.)

Thus, PBGC took roughly eight years from its appointment as trustee of the Plan to finish issuing the bulk of its BDLs, a result that is perhaps not surprising in light of the limited resources that it was able to devote to the Plan. Upon being appointed trustee, PBGC assigned the administration of the Plan to its Trusteeship Processing Division 5 ("TPD 5"), which devoted between three and six employees

---

4. PBGC petitioned the Court to appoint it as trustee should it find that the Plan should be terminated, but Judge Mukasey's Opinion and Order of November 25, 1991, did not do so, and the case was closed shortly thereafter.

5. Title IV provides that the benefits of missing participants are held in trust by PBGC until they can be found. 29 U.S.C. § 1350.

to the Plan at all relevant times. (LaPiana Dep. I at 35–39.) In addition, PBGC hired outside contractors to assist with the workload. Office Specialists served as the Plan's field benefits administrator, maintaining between two and ten auditors in a Rosedale, New York, office for the purposes of answering participant questions, collecting participant information, and reviewing participant and plan data. (Def. R. 56.1 Statement ¶ 19.) Office Specialists hired several former employees from Pan Am's pension department to assist it in collecting Plan documents and interpreting Plan practices. (*Id.*) In 1995, PBGC relocated the Office Specialists group to Atlanta in order to reduce its operating costs, over the objections of Suzanne LaPiana, the Manager of TPD 5, who felt that the move would severely reduce the quality and timeliness of Plan servicing. (Katz Aff. Ex. 32.) PBGC also employed Milliman USA as its actuarial contractor, to create a master list of all Plan participants, to calculate various benefit amounts and plan liabilities, and to create a computer program to calculate benefits. (Def. R. 56.1 Statement ¶¶ 22, 24.)

By 1995, Plan participants were beginning to question PBGC's administration of the Plan. In 1993, plaintiffs had formed the Association of Former Pan Am Employees, Inc. ("AFPAE"), to advocate on behalf of former Pan Am employees with respect to PBGC. (Pl. R. 56.1 Statement ¶ 21; Def. Ex. 63.) AFPAE made the first of several Freedom of Information Act ("FOIA") requests for information from PBGC in August 1995, seeking all documents relating to the decision to terminate the Plan and all records of PBGC's actions as the Plan's trustee. (Def. R. 56.1 Statement ¶ 67.) PBGC was apparently adequately responsive to this and subsequent AFPAE FOIA requests, as plaintiffs do not allege that they failed to receive any of the information requested in this manner.

After plaintiff Brooks was denied subsidized early retirement benefits in 1997, he requested documents related to PBGC's calculation of his benefits in order to facilitate his appeal. (Brooks Dep. at 126–27.) PBGC allegedly refused to provide this information except pursuant to a FOIA request (*id.*), although it waived the associated fees (Def.Mem.39 n. 18), because it viewed all Plan documents as "agency records" that could only be obtained through FOIA. Plaintiffs assert that they made other requests and were told to use FOIA (Katz Aff. Ex. 42), despite their lawyers' repeated assertions that PBGC's insistence on FOIA procedures was improper, since PBGC had an independent legal duty, as trustee of the Plan, to provide requested information to Plan participants. (*Id.*)

### III. *The History of This Litigation*

This case has been litigated for almost as many years as it took PBGC to issue its benefit determinations. Plaintiffs filed suit in September 1996, before PBGC had issued BDLs for the bulk of the Plan participants, and before any of the plaintiffs had received their BDLs. The initial Complaint alleged that PBGC had breached its fiduciary duty as the Plan trustee by refusing to issue BDLs for five and a half years after being appointed trustee, delaying responses to FOIA requests, commingling Plan assets, and acting in its own financial interest to minimize guaranteed benefits, rather than in the interests of Plan participants. (Compl.¶¶ 4, 12.) The case was assigned to Judge Preska, who then decided three motions to dismiss by PBGC, all centered on the issue of whether PBGC acts in its capacity as trustee when it calculates benefits, and therefore owes fiduciary duties to the Plan and its participants.

In November 1997, Judge Preska ruled on PBGC's initial motion to dismiss the

Complaint. *Pineiro v. PBGC* (*"Pineiro I"*), No. 96 Civ. 7392(LAP), 1997 WL 739581 (S.D.N.Y. Nov.26, 1997). She held that PBGC acted as guarantor in calculating benefit amounts, and that therefore its actions related to this function could not give rise to a claim for breach of fiduciary duty. Because 29 U.S.C. § 1346, which provides that PBGC or the plan administrator "shall furnish to the trustee" information regarding "the amount of benefits payable with respect to each participant," applies even when PBGC is not appointed the trustee of a terminated plan, she concluded that PBGC must act as guarantor when it calculates benefits. *Id.* at *9–*10. In contrast, the issuance of benefit determinations, after the amounts had been calculated, appeared to be a trustee function, as Title IV gives the trustee the power to pay benefits, 29 U.S.C. § 1342(d)(1)(B)(i). *Pineiro I*, 1997 WL 739581, at *10–*11. Therefore, plaintiffs' claim that PBGC violated fiduciary duties in calculating benefits necessarily failed, while their claim that the agency was dilatory in issuing BDLs could go forward. Judge Preska also suggested that plaintiffs amend their complaint to allege that, insofar as the delay in benefit calculations and the issuance of BDLs was due to PBGC's actions as guarantor, PBGC had "unreasonably delayed" action and should be compelled to act, pursuant to § 706(1) of the Administrative Procedure Act ("APA"). *Id.* at *19 & n. 16; *see also* 5 U.S.C. § 706(1) (providing that federal courts may compel "unlawfully withheld or unreasonably delayed" agency action). Finally, Judge Preska resolved several other issues against the plaintiffs, finding that the trustee of a terminated plan had no duty to police PBGC's actions as guarantor, that FOIA was the sole means by which Plan participants could obtain information about their benefits, and that as § 1342(a) specifically permitted PBGC to commingle plan assets, plaintiffs could not base a breach of duty

claim on such commingling. *Pineiro I*, 1997 WL 739581, at *12–*18.

Plaintiffs filed their second amended complaint on January 15, 1998, alleging once again that PBGC had acted as trustee in calculating benefits, and had violated its fiduciary duties. (Am.Compl.¶¶ 39–41.) In support of this assertion, plaintiffs attached to the Amended Complaint an internal PBGC memorandum that suggested that PBGC itself viewed benefit calculation as a trustee function. (*Id.* Ex A.) The Amended Complaint also sought relief under 5 U.S.C. § 706(1) for PBGC's unreasonable delay in issuing BDLs, to the extent that PBGC acted as guarantor. (*Id.* ¶¶ 85–86.) Finally, plaintiffs modified their allegations that PBGC had breached its fiduciary duty by failing to disclose information, claiming that PBGC had insisted that plaintiffs use FOIA to obtain benefits-related information that, as trustee, it was obligated to disclose under 11 U.S.C. § 704. (*Id.* ¶ 73.)

A month later, PBGC filed its second motion to dismiss, arguing that the amended complaint simply re-alleged claims that had been dismissed as a result of its first motion. In *Pineiro v. PBGC* (*"Pineiro II"*), No. 96 Civ. 7392(LAP), 1999 WL 195131 (S.D.N.Y. Apr.7, 1999), Judge Preska acknowledged that the law of the case doctrine would ordinarily preclude plaintiffs from raising the same claims that she had already dismissed, but found that the Amended Complaint and its attached exhibit "prompted a fresh look" at ERISA and her interpretation of its relevant provisions. *Id.* at *1–*2. She noted that § 1346, on which she had relied in *Pineiro I* in concluding that the calculation of benefits was a guarantor function, did not "expressly forbid the trustee from calculating benefits," and that "if the trustee were to carry out that responsibility, that would not be inconsistent with any provision of

Title IV." *Id.* at \*2. Thus, in *Pineiro II* Judge Preska held that plaintiffs might be able to prove facts that would support their theory that PBGC had acted as trustee in calculating benefits, and denied PBGC's motion to dismiss "as premature." *Id.* PBGC then moved for reconsideration, and to certify the issue for interlocutory appeal to the Second Circuit; Judge Preska denied both motions.

In May 1999, PBGC renewed its motion to dismiss the Amended Complaint, and in March 2000, Judge Preska issued a third opinion, denying the motion and expanding on her reasoning in *Pineiro II*. *Pineiro v. PBGC* ("*Pineiro III*"), No. 96 Civ. 7392 (LAP), 2000 WL 282894 (S.D.N.Y. Mar.15, 2000). She reiterated her conclusion that, taking the provisions of Title IV together, the statute does not expressly prohibit the trustee from calculating benefits, and that therefore plaintiffs must be given the opportunity to prove that PBGC acted as trustee in calculating benefits. *Id.* at \*2. She vacated that portion of *Pineiro I* that had held that PBGC as trustee had no duty to police the actions of PBGC as guarantor, finding that because § 1303(f)(1) allows the trustee to sue PBGC, "plaintiffs may state a claim for breach of fiduciary duty in cases where the PBGC takes actions as a guarantor that are uncontested by the PBGC as trustee due to conflicting interests." *Id.* at \*3. Judge Preska also held that, insofar as PBGC, in its capacity as trustee, was obligated to provide information about the Plan upon request, *see* 11 U.S.C. § 704, its refusal to do so except pursuant to FOIA's burdensome procedures could constitute a breach of fiduciary duty. *Pineiro III*, 2000 WL 282894, at \*5–\*6. Finally, she dismissed plaintiffs' claim of breach of fiduciary duty arising from PBGC's alleged mishandling of Plan participants' appeals of their BDLs, ruling that PBGC's administrative review process was a governmental function that was not subject to a fiduciary duty. *Id.* at \*4.

Not content to proceed with discovery on plaintiffs' alternate theories of breach of fiduciary duty and unreasonable delay of agency action, PBGC sought, and obtained, certification for an interlocutory appeal to the Second Circuit Court of Appeals. Judge Preska then stayed all further proceedings, pending the Circuit's review; the case was consequently stayed from April 2000 until November 2001. Although the Court of Appeals had granted PBGC's motion for leave to appeal, it later issued a summary order dismissing the appeal because the certification was improvidently granted. *Pineiro v. PBGC*, 22 Fed.Appx. 47 (2d Cir.2001) (unpublished opinion). The panel reasoned that its decision on the fiduciary duty issue would not terminate the case, since if it found that PBGC acted as guarantor in calculating benefits, plaintiffs would simply proceed with their APA claim. *Id.* at 49. Moreover, a more developed record would help the court to resolve the "complicated questions of statutory interpretation," which the panel would be "unwilling to decide . . . without first soliciting an amicus brief from the Department of Labor, and perhaps . . . from others as well." *Id.*

The case was reassigned to me in September 2000, while district court proceedings were stayed pending the Circuit's decision. Following the return of the case from the Court of Appeals at the end of 2001, discovery finally began in earnest in early 2002. Having now completed discovery, the parties cross-move for summary judgment.

## DISCUSSION

### I. *The Parties' Contentions*

Both parties' summary judgment papers are primarily devoted to re-arguing the

merits of *Pineiro III,* focusing on whether PBGC is subject to a fiduciary duty to Plan participants. Although both Judge Preska and the Second Circuit believed that discovery would clarify the questions of statutory interpretation that are fundamental to this case, neither party relies on facts learned in discovery in making their arguments as to what are essentially legal, not factual, issues. Resolving the question of PBGC's fiduciary duty entails discerning the statute's direction as to how PBGC should divide its functions when it serves as trustee and guarantor for a single plan, so that even if discovery revealed that PBGC in fact internally distinguished between its guarantor and trustee functions, or promulgated regulations on the subject, the question would remain whether PBGC's actions in this respect were consistent with the statute. Thus, even after a year of discovery, determining whether PBGC acts as trustee in calculating benefits, and is therefore subject to fiduciary duties, involves extrapolating from the powers and duties given to the trustee by Title IV, as well as the statute's structure and legislative history.

It is also striking, in view of the multiplicity of judicial opinions that this case has already occasioned, that neither party attempts to invoke the law of the case doctrine. This is perhaps understandable since, even after four decisions, very few legal issues have been authoritatively decided. Judge Preska herself vacated most of *Pineiro I,* and *Pineiro III* was considered by the Second Circuit but neither approved nor disapproved. The Court of Appeals' opinion itself did not establish any principles of law to guide the parties. Thus, notwithstanding the amount of judicial and attorney effort that has gone into this case, both parties are, in a sense, starting from scratch, and their legal arguments reflect the fact that the past seven years of litigation have yielded little progress.

Plaintiffs argue that, as Judge Preska concluded in *Pineiro III,* the broad powers given to the trustee include the power to calculate benefits. Moreover, the fact that the trustee must be provided with information regarding a plan's asset value and present liabilities, and is specifically given the power to hire actuaries, indicates congressional intent to place the responsibility for benefit calculations with the trustee. (Pl.Mem.35–38.) PBGC was therefore subject to the trustee's fiduciary duties in taking over the Plan and issuing BDLs. It allegedly breached its duty of loyalty by failing to separate its trustee and guarantor functions, and by taking actions in its own interest rather than in the interests of Plan participants. It also allegedly breached its duties of care and loyalty in taking an unreasonable amount of time to calculate and issue benefits, inadequately staffing the Plan, employing inadequate contractors, failing to properly interpret Plan documents, failing to disclose participant documents except through FOIA, and failing to provide an adequate appeals procedure. (Pl.Mem.44–48.) Plaintiffs argue that they have established these breaches as a matter of law, and are therefore entitled summary judgment and to "appropriate equitable relief" under § 1303(f), including the removal of PBGC as trustee and the appointment of a private trustee. (Am. Compl. ¶ 83; Pl.Mem.44.) [6]

PBGC argues that Judge Preska was right the first time, and seeks a return to the holding of *Pineiro I,* contending that *Pineiro III* incorrectly held that Title IV allows the trustee to calculate benefits. PBGC contends that the trustee's duties with respect to a terminated plan are essentially ministerial. Because the statutory trustee is appointed "to terminate" a

---

**6.** Plaintiffs do not seek summary judgment on their APA claim. (Pl. Mot. at 1.)

plan, 29 U.S.C. § 1342(c), the trustee's participation ends relatively soon after the termination date set by the court. (Def.Mem.23; Def. Opp. 6.) Thus, once PBGC had collected the assets of the Plan, it ceased to function as trustee, and took all subsequent actions in its governmental, guarantor capacity. (Def.Mem.23.) In addition, defendant argues that even had it been subject to a fiduciary duty, plaintiffs have proffered no facts that could establish that defendant breached that duty. (*Id.* 27–34.)

## II. *Summary Judgment Standard*

When adjudicating motions for summary judgment, a court must resolve all ambiguities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may

be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

## III. *The Trustee's Role in Terminating a Plan*

Title IV is designed to protect the interests of retirement plan beneficiaries when the employer is no longer able to sponsor the plan, and the plan has insufficient assets to cover its liabilities. These beneficiaries are unquestionably the most vulnerable of those protected by ERISA, as they often lose their jobs as a result of their employer's financial difficulties, even as they face the possibility that their expected pension benefits will be severely reduced or lost altogether. S.Rep. No. 93–383 (1973), *reprinted in* 1974 USCCAN 4889, 4892. Thus, Title IV provides two protections for participants in terminated plans: mandatory benefits insurance administered by PBGC, and the appointment of a trustee to ensure that the termination of the plan is carried out in the best interests of the beneficiaries. Congress could have assigned sole responsibility for plan terminations to PBGC in its capacity as agency and guarantor; instead, it provided that a trustee subject to duties of care and loyalty should oversee each termination. This represents a judgment that simply providing the insurance and assigning the guarantor sole responsibility for terminating a plan would not sufficiently protect beneficiaries' rights and interests.

Thus, Title IV must be interpreted in light of the fact that Congress expected the termination process to be regulated by

the fiduciary-beneficiary relationship. It is also clear, however, that Congress could not have intended the trustee to be bound to unmodified traditional fiduciary standards of conduct. Most fundamentally, Congress provided that PBGC, always the guarantor of terminated plan benefits, could also act as trustee, 29 U.S.C. § 1342(b), allowing the agency dual roles that, to some extent, create an inherent conflict of interest. While PBGC need not always serve as trustee, a fact that in itself renders the statute's provisions somewhat indeterminate, the statute's contemplation of PBGC's performing dual roles colors its conception of the trustee as a fiduciary, because it establishes that the trustee, unlike common law trustees, may have multiple fiduciary obligations to different plans, and thus conflicting responsibilities. Title IV also makes the trustee's fiduciary duty subject to the duties involved in termination, and authorizes the trustee to take various actions that, if performed by a traditional fiduciary, would constitute breaches of duty. For a striking instance, PBGC, in its capacity as trustee, is permitted to commingle the assets of the plans it trustees. *Id.* § 1342(a).

Thus, Congress clearly envisioned the trustee, at least when PBGC plays the role, as having somewhat different responsibilities than a traditional, common law fiduciary or even a Title I fiduciary of an ongoing plan. Plaintiffs envision PBGC in its trustee role as a traditional fiduciary, bound to the standard of "the punctilio of an honor the most sensitive," *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, C.J.), and conclude that the agency is obliged to maintain absolute separation between its functions, to act as trustee solely in the interests of the plan,

and even under some circumstances to sue itself. (Pl.Mem.39–41.) But because Congress deliberately assigned PBGC the possibility of inhabiting dual roles, with potentially conflicting obligations, it is difficult to determine the boundaries of the trustee's fiduciary obligations. Nonetheless, Title IV's language, structure, and legislative history indicate that Congress intended that the trustee, not PBGC as guarantor, would have responsibility for reconstructing the plan's documents, as well as calculating and paying benefits. Subject to the limitations inherent in the statute, when PBGC serves as trustee, it performs these functions as a fiduciary to the plan's beneficiaries.

Title IV provides that, after PBGC has sought and obtained the termination of an underfunded plan, the court appoints a trustee, and "authorize[s] him[ ] to terminate the plan in accordance with the provisions of this subtitle." 29 U.S.C. § 1342(c). As an initial matter, the parties disagree on what it means to "terminate" a plan, what tasks and functions termination entails, and when termination is complete. PBGC argues that terminating a plan involves merely collecting its assets, recovering amounts owed to the plan, and turning those assets over to PBGC for payment of benefits. (Def.Mem.23.) Only then does PBGC, as guarantor, begin to calculate benefit amounts. (*Id.*) This theory is belied, however, by the broad powers granted to the trustee. The fact that the trustee may "do any act authorized by the plan or this subchapter to be done by the plan administrator," 29 U.S.C. § 1342(d)(1)(A)(i), suggests that terminating a plan is more akin to administering an ongoing plan than PBGC asserts (Def.Opp. 2–4).[7] If terminating a plan consisted

---

7. PBGC also argues that this extensive power, granted by § 1342(d)(1)(A), is given only to interim trustees appointed under § 1342(b) before a plan is actually terminated, and not to trustees appointed to terminate a plan under § 1342(c). (Def.Opp. 2–3.) This is clearly not the case, however, as § 1342(d)(1)(B), which enumerates the powers given to trustees appointed under § 1342(c), provides that

merely of rounding up the assets and transferring them to PBGC, there would be no need for the trustee to perform the functions of the former plan administrator, which could include interpreting the plan and doing any other act authorized by the plan itself. Other powers given to the trustee, such as litigating on behalf of the plan, 29 U.S.C. § 1342(d)(1)(B)(iv), and investing the plan's assets, *id.* § 1342(d)(1)(A)(iii), also indicate that plan termination can be a long-term process involving ongoing oversight of the plan as a whole.

PBGC argues that the fact that the trustee's fiduciary duties are expressly made subject to the provisions of Title IV, *id.* § 1342(d)(3), indicates that a Title IV trustee's fiduciary duties are so limited that the trustee's responsibilities in terminating a plan must be essentially ministerial. (Def.Mem.22–23.) Section 1342(d)(3) provides that a trustee has the same fiduciary duties of care and loyalty owed by fiduciaries of ongoing plans, as well as the specific duties of a Chapter 7 bankruptcy trustee, "[e]xcept to the extent inconsistent with the provisions of [Title IV]." There is no indication amongst the other provisions of Title IV, however, that the trustee's fiduciary duties are drastically circumscribed, because the duties inhere in all discretionary actions taken by the trustee. 29 U.S.C. § 1002(21). As Judge Preska noted in *Pineiro I,* several of Title IV's provisions mandate that the trustee take certain actions, including preventing the plan's assets from injuring to the benefit of the employer, *id.* § 1103(c), avoiding in-

creasing PBGC's liability, *id.* § 1342(d)(1)(A)(vi), and allocating the assets to some participants at the expense of others, *id.* § 1344. *Pineiro I,* 1997 WL 739581, at *2. These provisions supersede the trustee's fiduciary duty because they require that certain actions be taken, even if such actions would normally be a breach of the duty of loyalty if taken by a traditional fiduciary. *Id.* Aside from these mandatory provisions, the trustee is given a number of discretionary powers that allow it to administer the plan and manage its assets. Since the trustee's discretion with respect to these powers, which provide the bulk of its oversight authority, is not limited, and plan trustees are bound by fiduciary duty to the extent that they exercise discretionary authority with respect to the plan, 29 U.S.C. § 1002(21), 1104(a), the trustee's fiduciary duties inhere in its general oversight of the plan.[8] While the scope of the duties must be determined in light of the fact that the trustee is not a traditional fiduciary, and the needs of participants of terminated plans are often different from the needs of ongoing plan participants, the "provisions of [Title IV]" are certainly not so inconsistent with fiduciary duties as to render them meaningless, as PBGC appears to argue. (Def.Mem.23.) PBGC's interpretation would render § 1342(d)(3)'s explicit imposition of the general duties of care and loyalty on Title IV trustees superfluous. Thus, there is no basis to believe that the trustee's responsibilities and fiduciary duties are so limited that terminating a plan involves only ministerial functions.

---

these trustees shall have the powers given to interim trustees by subsection (A), in addition to the ones specifically granted by subsection (B).

8. PBGC notes that some of these powers allow the trustee to take actions that might, at first glance, appear to conflict with its fiduciary duties (Def.Mem.23), such as limiting bene-

fit payments to basic benefits, 29 U.S.C. § 1342(d)(1)(A)(iv). Exercising these powers would not require a trustee to violate its fiduciary duties, however, since administering an underfunded plan in the interests of all its participants, *id.* § 1104(a)(1), might require the trustee to limit all payments in order to protect the equities across classes of beneficiaries.

This interpretation is supported by the fact that the statute does not provide an endpoint at which the plan is completely terminated and the trustee's tasks are complete. Section 1348 provides that the court shall set a "termination date" as the date on which benefits stop accruing. This date is the date on which all participants had constructive notice that the plan might be terminated. *In re Pan Am. World Airways*, 777 F.Supp. at 1184. The trustee who is authorized "to terminate" the plan under § 1342(c) is often not appointed until after the termination date, however, indicating that the termination date is relevant only to accrual of benefits. Accordingly, both parties appear to agree that it is not the date as of which the plan is "terminated" for purposes of the trustee's functions. (Def.Opp. 6–7.) Here, the Plan's termination date was July 31, 1991, but PBGC did not become trustee until December 1991. (Def.Ex.15.)

Plan "termination" is not defined in the statute, but there is evidence that terminating a plan is an extended process. The trustee is given the power to pay benefits, and to receive payments for guaranteed benefits from PBGC, 29 U.S.C. § 1342(d)(1)(b)(i), (iii), without any indication that these duties might end, suggesting that the trustee's responsibilities continue as long as there are living participants and survivors entitled to monthly benefit payments. This in turn indicates that the plan remains in existence (since there could be no trustee without the plan) as long as there are benefits to be paid, even decades after the decree of termination. This is not as counterintuitive as it first appears, because the plan as an entity consists of more than just its assets. As long as there are participants receiving benefits, there is the possibility that the trustee will have to provide information about benefits and the plan's provisions, even after participants die and their spouses become entitled to survivor benefits. In addition, litigation conducted by the trustee on behalf of the plan, *see id.* § 1342(d)(1)(B)(iv), could last for years after the decree of termination, as it has here. Thus, while the plan is no longer operative, in the sense that benefits are no longer accruing and new participants no longer coming in, the plan as a set of obligations and liabilities continues to exist as long as there are remaining participants. Since the trustee's powers include duties that will continue throughout the plan's existence, it is clear that the trustee remains involved with the plan long after benefits have been calculated and participants' rights determined.

Thus, PBGC's emphasis on the distinctions between "terminated" and "ongoing" plans, and between trustee and plan administrator (Def.Mem.24), is somewhat exaggerated. While participants' rights under a plan change drastically when the plan is subject to termination, there are fewer differences in the administrative needs of ongoing and Title IV plans than PBGC would suggest, since both require calculating and paying benefits, interacting with and giving information to participants, managing the plan's assets, and litigating on behalf of the plan. *See* 29 U.S.C. § 1342(d). Thus, contrary to PBGC's arguments (Def.Mem.24–25), considerable administration is involved in overseeing terminated plans, much of it discretionary.

The scope and nature of the powers given to the trustee indicate that this day-to-day operation, including calculation of benefits under the plan, is part of the trustee's responsibilities. The trustee's power to "do any act" in the power of the plan administrator will often include the power to interpret the plan in order to determine eligibility for benefits and to calculate benefits, since these are the primary responsibilities of the plan adminis-

trator while the plan is ongoing.[9] *Dycus v. PBGC*, 133 F.3d 1367, 1369 (10th Cir.1998). This broad grant of responsibility suggests that Congress intended that the trustee, just like the plan administrator, would be in charge of the operation of the plan.[10]

Moreover, the trustee is explicitly given the power to pay benefits, 29 U.S.C. § 1342(d)(1)(B)(i), which necessarily implies the power to calculate benefit amounts. To this end, Title IV provides the trustee with two types of assistance. First, § 1346 mandates that "the corporation [PBGC] and the plan administrator of any plan to be terminated ... shall furnish to the trustee such information as [they have] and ... can obtain," with respect to the amount of benefits payable to each participant, the amount of guaranteed benefits, the present value of plan assets, and "any other information with respect to the plan the trustee may require in order to terminate the plan." This provision ensures continuity between the plan administrator and the trustee, as the administrator is, at the time of the decree of termination, the party most knowledgeable about the specifics of the plan and participant entitlement under its terms. The fact that the trustee is presumed to need detailed information as to the plan's assets, benefits payable, and amount of basic benefits guaranteed, indicates that the trustee is intended to be the entity responsible for calculating whether full benefits can be paid, or whether the plan will have to rely on PBGC's guarantee. With this information, the trustee can ascertain the extent to which the plan is underfunded, which will influence whether it limits payment under the plan to basic benefits, as § 1342(d)(1)(A)(iv) allows it to do, or continues to pay full benefits. The trustee can also use the information to make the allocation of assets to pay certain types of benefits, as required by § 1344.[11] These tasks necessarily require calculating actual benefit amounts and interpreting the plan to determine entitlements; thus, § 1346's informational requirements further the conclusion that it is the trustee who is to calculate benefits.[12]

---

9. Thus, PBGC, as trustee of the Pan Am Plan, has the power to perform any of the functions that the Pension Committee, Pan Am's former Plan administrator, could do according to the terms of the Plan. The Plan gives PBGC, as trustee, the power to "construe the Plan and to determine all questions of fact that may arise thereunder," and to "establish the actuarial assumptions and methods used to determine the amount of benefits." (Katz Aff. Ex. 10, at VII-2 to -3.)

10. While PBGC argues that it does not become "plan administrator" of the plans it trustees, because plans subject to Title IV do not have plan administrators, § 1342(d)(1)(A)(i)'s grant to the trustee of all powers given to the plan administrator makes PBGC the functional equivalent of the administrator for the plans for which it serves as trustee. *Dycus*, 133 F.3d at 1369 (equating PBGC with the former plan administrator with respect to a terminated plan for which it had been appointed trustee).

11. Section 1344 requires that the plan administrator allocate the plan's assets in a specific order of priority. As noted above, the trustee is empowered to perform this task by § 1342(d)(1)(A)(1).

12. Contrary to PBGC's argument, the fact that § 1346 requires PBGC and the plan administrator to furnish "information ... regarding the amount of benefits payable with respect to each participant" does not indicate that PBGC must make the calculation without the trustee's participation. Although PBGC reads this language to mean that it must transmit, essentially, "an account of the benefit amounts that it calculated," the phrase "information ... regarding the amount of benefits" could be read more generally, to refer to "information necessary to make benefit calculations." Moreover, the structure of this and other information-sharing provisions militates against reading the provision to imply that PBGC is the one to calculate benefits. First, section 1346 does not distinguish be-

Second, the statute provides that the trustee may "appoint, retain, and compensate accountants, actuaries, and other professional service personnel," and directs PBGC to promulgate regulations to govern this function. *Id.* § 1342(h)(2). The trustee would have no need to retain actuaries, who generally calculate benefits based on premiums paid and various actuarial factors, if it were not to calculate benefit amounts. Indeed, this provision would make little sense if PBGC were correct that the trustee's role is essentially limited to collecting the plan's assets and transferring them to PBGC.

The trustee's power to pay benefits is paired with the power to "receive any payment made by the corporation to the plan under this subchapter." *Id.* § 1342(d)(1)(B)(iii). These powers, taken together, suggest that the trustee calculates the benefits to which plan participants are entitled, PBGC as guarantor then calculates the proportion of those amounts that is guaranteed under § 1322(a) and pays that amount to the trustee, and the trustee in turn pays the guaranteed amount to each participant. *See Pineiro I*, 1997 WL 739581, at \*10–\*11. Indeed, this is exactly the division of labor that the legislative history envisions for the trustee and PBGC as guarantor:

"After a final decree that a plan should be terminated, the trustee is to collect amounts due the plan, pay benefits in accordance with the allocation rules already discussed, and receive payments from the insurance Corporation for funding of guaranteed benefits." S.Rep. No. 93–383, 1974 USCCAN at 4976. This statement is yet another indication that Congress intended that the trustee would oversee the operation of the plan, with all its attendant responsibilities, while PBGC in its capacity as guarantor would have the comparatively limited role of determining which benefits were guaranteed, and paying the guaranteed portion of each individual's benefits.

Thus, Title IV envisions a broad role for the trustee that includes the powers formerly held by the plan administrator, the power to hire actuaries, the power to calculate and pay benefits, and to litigate on behalf of the plan. These broad powers in themselves suggest that PBGC's responsibility for plan termination, in its capacity as guarantor, is proportionately limited. Moreover, the statute does not contain any provisions that suggest a broader role for PBGC as guarantor. The bulk of PBGC's statutory powers concern imposing and collecting premiums, 29 U.S.C. § 1307, determining whether a plan should be termi-

tween information to be provided by PBGC and that to be provided by the plan administrator, and in practice the administrator is far more likely to have information as to individual benefit amounts at the time of the decree of termination. As PBGC itself asserts in recounting its efforts on the Pan Am Plan, simply determining individual benefit amounts can require years of reconstructing plan documents and practice once PBGC takes over a plan, so it is unlikely that Congress intended that PBGC, rather than the administrator, would be providing this information to the trustee before the trustee has begun to terminate the plan, as § 1346 contemplates. Second, § 1341(c)(2) requires the plan administrator to furnish to PBGC substantially the same information covered by

§ 1346 when PBGC provides notice that it intends to terminate the plan. *See* 29 U.S.C. § 1341(c)(2) (requiring that administrator provide to PBGC the current value of plan assets, the "actuarial present value ... of benefit liabilities under the plan," and the amount of guaranteed benefits). Thus, even if PBGC were to assume responsibility for furnishing to the trustee all of the information mandated by § 1346, it could simply transmit the information that it had previously received from the plan administrator. Section 1346 and 1341, taken together, reflect the assumption that the plan administrator will possess all of the information about the plan at the time of termination, will pass it on to PBGC, and either or both entities will furnish it to the trustee.

nated, and seeking a decree of termination, *id.* §§ 1341–42. PBGC is also given the power to litigate to enforce the provisions of Title IV, *id.* § 1303(e), to audit terminating plans, *id.* § 1303(a), to calculate the amount of benefits that are guaranteed, *id.* § 1322, and to promulgate regulations to carry out Title IV's purposes, *id.* § 1302(b)(3). Thus, PBGC in its capacity as guarantor is not specifically given any powers of plan administration or benefits calculation. Rather, these powers are given to the "trustee," indicating that these functions are to be performed by the plan fiduciary. Had Congress wished to allow PBGC to perform benefits administration functions free of any fiduciary duty, it would have imbued the corporation with these powers, independently of, and in addition or in place of, the trustee. Accordingly, when PBGC calculates and pays benefits, it does so as trustee.

The fact that "[n]otwithstanding any other provision of [Title IV], the corporation is authorized to pool assets of terminated plans for purposes of administration, investment, [and] payment of liabilities of all such terminated plans," *id.* § 1342(a), does not affect this conclusion. PBGC argues that the fact that "the corporation" is given this power means that PBGC controls plan assets in its capacity as guarantor, which in turn indicates that PBGC calculates benefits and administers the plan as guarantor rather than as trustee. (Def.Opp. 7.) The language is at best ambiguous. PBGC argues that when the statute refers to "the corporation," it means "the corporation in its capacity as guarantor," because it uses "the trustee" when it means to refer to the trustee. (Def.Mem.20.) There is no indication that the references to "the corporation" are anything more than references to PBGC as an entity, however. The statute defines

"corporation" simply as "the Pension Benefit Guaranty Corporation," 29 U.S.C. § 1301(a)(4), without any mention of its various functions, and given the statute's authorization for PBGC to serve as trustee, *id.* § 1342(b), nothing in the statute warrants reading "the corporation" to entail PBGC's guarantor function to the exclusion of its other responsibilities. Notwithstanding the indeterminacy of the pooling language, other Title IV provisions and the legislative history establish that the pooling provision is simply a clarification that PBGC, as the trustee of multiple plans, may pool plan assets as trustee, unlike private trustees, who were probably not expected to trustee multiple plans, and would not be entitled to pool plan assets in any event.

First, § 1350 provides that the plan administrator (or the trustee) shall transfer the assets representing benefits due to missing participants to PBGC, so that it can hold them until the participant is found. Such a transfer "shall be treated as a transfer of assets from a terminated plan to the corporation as trustee, and shall be held with assets of *terminated plans for which the corporation is trustee under section 1342.*" *Id.* § 1350(a)(2) (emphasis added). Thus, PBGC pools and manages both missing participant assets and the assets of certain terminated plans, in its capacity as trustee. By referring to the assets of "terminated plans for which the corporation is trustee," § 1350 also makes clear that the only plan assets that PBGC exercises control over, and can pool under § 1342(a), are those of plans "for which the corporation is trustee." Thus, PBGC as guarantor has no general power over the assets of terminated plans; if a private trustee were to oversee a plan's termination, that trustee, not PBGC, would hold and control the plan's assets.[13] Section 1350 also indicates that PBGC acts in

---

13. Indeed, the powers given to the trustee, such as investing and liquidating assets, indicate that it is the trustee who has control over

plan assets. 29 U.S.C. §§ 1342(d)(1)(A)(iii), (d)(1)(B)(vi).

its capacity as trustee in managing all of the assets that it pools, as it would not make sense for PBGC to pool the missing participants' assets with the plan assets, while holding the missing participant assets as trustee and the plan assets as guarantor. This differentiation in PBGC's capacities with respect to pooled assets from different sources would defeat the efficiency gained from pooling.

Second, the legislative history establishes that PBGC is to manage pooled assets as trustee. PBGC argues that, prior to 1987, the wording of the pooling provision strongly suggested that PBGC's control over plan assets was subject to a fiduciary duty, but was modified in 1987 to remove that language. (Def.Opp. 7–8.) The pre–1987 provision stated, "[PBGC] is authorized to pool the assets of terminated plans for purposes of administration ... not inconsistent with its duties to the plan participants." 29 U.S.C. § 1342(a) (1986) (superseded). The fact that the current statutory language does not mention PBGC's duty to plan participants, PBGC argues, reflects congressional intent that PBGC should manage assets in its guarantor capacity. The legislative history of the 1987 amendment indicates the contrary, however, stating that the amendment was not meant to change existing law in any way, but simply to "recognize[ ] in a more explicit way the long-standing practice of the PBGC of treating all pooled assets of terminated plans as available for the payment of obligations of any plan." H.R. Rep. 100–391(I) (1987), *reprinted in* 1987 USCCAN 2313–1, 2313–127. The same report states that PBGC holds these assets "as trustee," *id.* at 2313–79, and that it may use the assets for investments and payment of benefits, *id.* at 2313–127, which

are powers that Title IV gives to the trustee. Thus, the purpose of removing the language, "not inconsistent with its duties to the plan participants" from the pooling provision was apparently to clarify that PBGC's pooling assets would not be a breach of its fiduciary duties to any one plan, despite the traditional fiduciary rule that pooling would be a per se breach of duty. *Id.* Read as a whole, the legislative history of the provision's current language indicates congressional intent to have PBGC manage pooled assets as trustee, just as was reflected in the pre–1987 language.

Finally, PBGC argues that if Congress meant the trustee to calculate benefits, it would have provided for the possibility that PBGC would disagree with the trustee's calculation of benefits, and the lack of a procedure for resolving such conflicts therefore indicates that PBGC alone is to calculate benefits, in its capacity as guarantor. (Def.Mem.21.) Title IV does provide a procedure for resolving these conflicts, however, when the trustee is a separate entity from PBGC. If PBGC were to disagree with the trustee's calculations, it could simply pay the trustee for guaranteed benefits based on its own calculations of benefit amounts. The trustee could then sue PBGC to resolve the conflicting interpretations of the plan and recover any amounts wrongfully withheld. 29 U.S.C. § 1303(f). Conversely, when PBGC serves as both trustee and guarantor, this type of conflict simply will not arise; given PBGC's statutory authorization to perform both roles without separating its functions (*see infra* Part IV.A), it is highly unlikely that PBGC would be calculating benefits twice, in each of its two roles.[14]

---

**14.** While Judge Preska held that, in theory, PBGC-as-trustee could sue PBGC-as-guarantor, as § 1303(f) allows the "plan fiduciary" to sue PBGC, *Pineiro III*, 2000 WL 282894, *3, there is no evidence that Congress intend-

ed such an absurd result. As discussed above, Title IV allows PBGC's dual roles to influence each other, and does not require PBGC as trustee to function precisely as a

While Title IV does not explicitly provide that the trustee must calculate benefits, it is replete with indications that Congress intended that the trustee would be responsible for collecting plan documents and participant data, interpreting the plan's provisions, and calculating benefits. This interpretation gives full effect to Congress's purpose in creating the trustee to oversee plan terminations, while PBGC's view of the trustee as passive and ministerial would render the trustee's inclusion in Title IV essentially meaningless. The statute's purpose of protecting employees whose benefits are threatened by their pension plan's financial instability is best furthered by placing the functions most vital to participants' well-being, interpreting the plan and determining benefits, with a fiduciary that is bound to act in their best interests.

Taken together, the provisions of Title IV establish that, when PBGC is appointed a plan's trustee following a decree of termination, it is subject to a fiduciary duty in all actions except those involving the function, statutorily reserved to the agency, of calculating the amount of benefits that are guaranteed under § 1322. *Burstein v. Ret. Account Plan for Employees of Allegheny Health Ed. and Res. Found.*, 334 F.3d 365, 381–82 & n. 23 (3d Cir.2003) (holding that PBGC acts as trustee for plans subject to termination except when it calculates guaranteed amounts under § 1322). Thus, plaintiffs may maintain their claims for breach of fiduciary duty based on PBGC's calculation of benefit entitlements under the terms of the Plan, its issuance of BDLs, its general management of the Plan, and its interactions with Plan participants that related to its actions as trustee. *Id.* at 382 (stating that plaintiff had stated a claim "against the PBGC

as administrator" for plan benefits based on its actions as trustee); *Burstein v. Ret. Account Plan for Employees of Allegheny Health Ed. and Res. Found.*, 2003 WL 21771918 (3d Cir. Aug.1, 2003) (clarifying that in referring to PBGC "as administrator," the court was using shorthand for PBGC's functions as "statutory trustee").

## IV. *PBGC's Alleged Breaches of Fiduciary Duty*

Plaintiffs allege that PBGC breached its fiduciary duties in a variety of ways. First, plaintiffs claim that PBGC has breached its duty of loyalty by failing to separate its trustee and guarantor functions. (Pl.Mem.46.) Second, they assert that PBGC's management of the process of gathering Plan documents and information, calculating benefit amounts, and issuing BDLs, was so inadequate that it resulted in inordinate delays in issuing final benefit determinations, and was not carried out in the exclusive interests of Plan participants. (Am. Compl. ¶¶ 62–63; Pl. Mem.11–25.) Third, PBGC allegedly failed to consider and honor relevant Plan documents and practices, resulting in plaintiffs' receiving lower benefits (Am. Compl. ¶¶ 67; Pl.Mem.20–23), and wrongfully refused to reconsider its benefit calculations after discovering new data in 2001 (Pl.Mem.22). Fourth, plaintiffs allege that PBGC breached its duty to disclose information, by insisting that they use FOIA procedures to obtain Plan documents, in violation of 11 U.S.C. § 704(7), by issuing BDLs containing insufficient information, and by failing to disclose various decisionmaking processes. (Am Compl. ¶¶ 72–73; Pl.Mem.47–48.) Fifth, plaintiffs claim that PBGC acted to limit the survivorship benefits of spouses of de-

---

traditional fiduciary. There is no reason that PBGC cannot calculate benefits, while remaining cognizant of its fiduciary responsibil-

ities, without maintaining the rigidly separated bureaucracies that would allow it to sue itself.

ceased participants. (Pl.Mem.24–25.) Sixth, plaintiffs assert that PBGC denied them their right to appeal their BDLs by maintaining overly harsh procedural rules. (Am. Compl. ¶¶ 62; Pl.Mem.45.) Finally, PBGC allegedly attempted to interfere with plaintiffs' source of funding for this litigation. (Pl.Mem.25.)

### A. Structural Conflict of Interest

Plaintiffs assert that PBGC has failed to remedy the inherent, structural conflict of interest created by its performing the dual roles of trustee and guarantor. (Pl.Mem.44–46.) PBGC does act under an inherent conflict of interest, since PBGC-as-trustee, acting with participants' interests in mind, presumably seeks the highest allowed benefits for each, while PBGC-as-guarantor must closely scrutinize the plan in light of the statute in order to determine which benefits are guaranteed, and to what extent. Plaintiffs concede that this inherent conflict cannot constitute a breach of the trustee's fiduciary duty, however, as Congress has explicitly provided that PBGC may perform both functions for plans subject to termination, 29 U.S.C. § 1342(b); *Pineiro I*, 1997 WL 739581, at *7. (Pl.Opp. 19–20.) Yet they argue, somewhat circularly, that because PBGC has an inherently "conflicted decision-making process," (Pl.Mem.39), it has therefore breached its duty of loyalty by not keeping its trustee and guarantor functions separate, maintaining separate legal counsel, maintaining procedures and guidelines separating the functions, or instructing its employees on the different functions. (*Id.* at 46.) Essentially, plaintiffs argue that PBGC should maintain two entirely separate bureaucracies to ensure that no conflict of interest ever arises.

While giving lip service to the notion that they cannot claim that PBGC inherently breaches its fiduciary duty whenever it acts as trustee (Pl.Opp. 19–20), plaintiffs' arguments ignore the implications of PBGC's explicit statutory authorization to act in both capacities. While a traditional trustee is subject to an absolute fiduciary duty to act solely in the interests of its beneficiaries in all circumstances, Title IV explicitly qualifies the termination trustee's duty by making it subject to the necessities of terminating the plan. 29 U.S.C. § 1342(d)(3). In addition, PBGC, when acting as trustee, is authorized to take actions, such as commingling the assets of the plans it administers as trustee, *id.* § 1342(a), that would almost certainly be per se breaches of fiduciary duty if done by traditional trustee. At the same time, Title IV nowhere provides that PBGC must separate its functions or maintain separate bureaucracies when it chooses to serve as trustee for a terminated plan. *Cf. Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (holding that as to Title I fiduciaries, "ERISA … require[s] … that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions"). Congress specifically authorized a single agency, PBGC, to act in both capacities. If it intended to require such an unusual dual structure for the agency, it would surely have so specified.

In light of PBGC's authorization to take actions that might otherwise constitute fiduciary breaches, without requiring any separation of functions, there is no basis for construing its general duty of loyalty, 29 U.S.C. § 1104(a)(1)(A)(i), to include the duty to separate its functions. The statute contemplates that PBGC will have to balance its trustee responsibilities with its guarantor interests, and its duty to act in the interests of plan participants with its duty to limit or even recover benefits. While PBGC acts as trustee when performing most tasks necessary to terminate a plan, the scope of its fiduciary duty must be determined in light of the fact that, by

giving PBGC multiple functions, Congress evidently intended that PBGC to be something other than traditional fiduciary. Courts are to apply the common law of trusts in giving scope and content to ERISA's general fiduciary duties "bearing in mind the special nature and purpose" of ERISA and employee benefit plans. H.R. Conf. Rep. 93–1280 (1974), *reprinted in* 1974 USCCAN 5038, 5083. Here, the statute makes clear that unconsidered reliance on the common law trusts rule of absolute separation would contradict the evident congressional intent to allow PBGC to oversee terminations more efficiently by consolidating its functions.

**B.** *The Delay in Issuing BDLs as Breach of Fiduciary Duty*

Plaintiffs claim that the fact that PBGC took five years to begin issuing BDLs, and eight years to complete the bulk of the task, is a breach of its duties of loyalty and care. (Pl.Mem.20–25.) They argue both that the delay itself was a breach of its duties, and also that various actions that PBGC took in reconstructing Plan data and calculating benefits, such as selecting contractors and staffing the Plan, contributed to the delay and constituted breaches of its duties.[15]

**1.** *Breach of the Duty of Loyalty*

Plaintiffs assert that PBGC took so long to issue BDLs because it was acting in its own interest, rather than in that of the Plan participants. Because PBGC's mere failure to separate its functions does not constitute a breach of its duty of loyalty, plaintiffs must proffer facts that raise an inference that PBGC acted under an actual conflict of interest, by establishing that PBGC took specific actions that were motivated by interests other than those of the Plan participants, or that its decisionmaking patterns suggest that PBGC was not concerned with providing participants with their due under the Plan and Title IV. Plaintiffs have presented evidence of two concrete examples of occasions in which PBGC may have acted with interests other than plaintiffs' in mind, and which may have contributed to the length of time that PBGC took to issue BDLs.[16]

First, in 1995, PBGC decided to relocate the Rosedale, New York, office of its contractor, Office Specialists, to Atlanta, Georgia. (Katz Aff. Ex. 34.) The move was made in order to reduce PBGC's operating costs in administering the Plan, and was approved over the objections of Suzanne LaPiana, who was in charge of PBGC's trusteeship of the Plan. (*Id.*) She felt that the move would adversely affect PBGC's servicing of the Plan, by severely reducing the number of employees with Pan Am expertise, inhibiting access to Plan records, and necessitating excessive administrative labor. (*Id.* Ex. 32.) Nonetheless, PBGC decided to make the move, reasoning that very few Plan participants ever came in person to the New York office, so that their needs could be adequately dealt with by phone from Georgia. (*Id.* Ex. 34.) Thus, there is some evidence that PBGC made the move with its own

---

**15.** Plaintiffs also assert that PBGC did not allow Plan participants to appeal their estimated benefit amounts for almost ten years, and that this was a breach of its duties. (Pl. Mem.45.) This is essentially a restatement of plaintiffs' basic claim that the benefit determination process took too long, as the thrust of the argument is that there were no determinations to appeal until eight years after the bankruptcy.

**16.** Plaintiffs have made other allegations of conflicted actions, but have not supported them with any evidence, and therefore cannot rely on them to establish breach of duty. In particular, they assert that "PBGC's benefit determination process was designed to minimize the possibility that . . . Plan participants would be able to file a reasoned and well documented appeal," (Pl.Mem.15), but have not offered any evidence of this motivation.

interests in mind, despite the knowledge that it could adversely affect its servicing of the Plan and its participants.

■ Whether or not this constitutes a breach of PBGC's duty of loyalty is another question. No fiduciary is obligated to throw unlimited amounts of money at plan administration; only when the trustee's cost-cutting becomes unreasonable does the potential for a fiduciary breach arise. PBGC is trustee of hundreds of terminated plans, and the money for plan administration comes not from the plan itself, which has no assets, but from public funds.[17] Unlike a traditional fiduciary, which is required to take all actions solely in the interest of one particular plan, considering costs only insofar as they are reasonable for that plan, PBGC's mandate requires it to act in the overall interest of the pension guarantee and administration program it is charged with operating. Therefore, actions taken in order to remain within the budgetary limits prescribed by Congress cannot constitute per se breaches of PBGC's fiduciary duty. While arbitrary cost-cutting actions may rise to the level of fiduciary breaches, all of PBGC's budgetary decisions must be evaluated deferentially, keeping in mind its multiple responsibilities and limited funds. Thus, while the question of whether the office move constituted a breach of fiduciary duty must be resolved by the factfinder at trial, plaintiffs will have to present evidence that, despite PBGC's many responsibilities and financial constraints, the move was so adverse to plaintiffs' interests, and so lacking in justification, as to be completely arbitrary and irresponsible.

Second, plaintiffs argue that PBGC's 1998 hiring of Integrated Management Resources Group, Inc. ("IMRG"), to replace Office Specialists as its primary Plan contractor, was tainted by an improper conflict of interest. (Pl.Mem.18.) According to a General Accounting Office report entitled, "Appearance of Improper Influence in Certain Contract Awards," PBGC's Insurance Operations Department head, Benny Hagans, improperly influenced PBGC's contracting department to hire IMRG, because it was run by a former Office Specialists employee who was Hagans's friend. (Katz Aff. Ex. 39.)[18] While Hagans testified in his deposition that he had not influenced the selection process (Hagans Dep. at 95–98), his conduct was apparently investigated by the Department of Justice, and the GAO concluded that "PBGC lacked a sound business rationale to support its approach for contracting for services at four field offices [including that of the Plan] ... and may have limited competition." (Katz Aff. Ex. 39 at 1.) A reasonable factfinder could conclude that PBGC selected the Plan's contractor without the Plan's needs and interests in mind, and therefore breached its duty of loyalty.

At the same time, however, it is not clear that any equitable relief based on this breach, even if found to have occurred, would be appropriate. First, plaintiffs

---

17. PBGC''s budget is divided into "limitation" and "non-limitation" funds. (Katz Aff. Ex. 19.) Limitation funds are those devoted to PBGC's general services and overhead, and PBGC must obtain explicit congressional approval before it exceeds this budget. Non-limitation funds are used for "trustee services," including plan administration (*id.*), and should it exceed this budget, PBGC can request additional funds from the Office of Management and Budget without congressional approval. Even non-limitation funds are presumably not unlimited, and are subject to OMB approval.

18. Plaintiffs may rely on this report for the truth of the matters discussed in it because its falls within the exception to the hearsay rule contained in Fed.R.Evid. 803(8)(C). *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164–69, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

have not proffered evidence that they suffered concrete harm as a result of the conflict. IMRG was not hired until 1998, a year after plaintiffs had received their BDLs, so there is no evidence that IMRG ever worked on their benefits, or affected them in any way. (*Id.* Exs. 22, 23, 39.) They also have not alleged any negligence or defective performance on IMRG's part. Second, given the number of decisions PBGC made with respect to the Plan, it is difficult to conceive how one tainted decision, unlinked to any concrete harm, could be grounds for any type of equitable relief. Moreover, while PBGC is responsible for the actions of its agents, an isolated corrupt act by a single officer of a federal agency might well not warrant removal of that agency as trustee, absent evidence that the allegedly corrupt official exercised substantial responsibility for the administration of the Plan.

### 2. *Breach of the Duty of Care*

█ Plaintiffs also argue that PBGC breached its duty of care in taking eight years to issue BDLs. PBGC is obligated to perform its duties using the degree of diligence possessed by a "prudent man acting in like capacity and familiar with such matters" under the circumstances. 29 U.S.C. § 1104(a)(1)(B). Thus, the standard by which its conduct must be judged is essentially one of reasonableness. At the same time, PBGC's actions are entitled to some deference, as Congress has entrusted the agency with serving as trustee for multiple pension plans, and PBGC, unlike most employer-fiduciaries of ongoing plans, exists for the express purpose of insuring, administering, and terminating these plans. Its accumulated expertise, as well as the undeniably complicated nature

of organizing and mastering terminated plans, must be taken into account in assessing its conduct. *Cf. LTV Corp.*, 496 U.S. at 651–52, 110 S.Ct. 2668 (stating that PBGC's "practical agency expertise is one of the principal justifications behind *Chevron* deference").

Although both sides claim that the material facts are undisputed and their cases are complete by moving for summary judgment, whether PBGC acted reasonably under the circumstances is fundamentally a disputed question of fact. Plaintiffs have provided little specific evidence suggesting that PBGC's actions were unreasonable, appearing to argue that the length of time itself is per se evidence of dereliction. At the same time, PBGC has proffered almost no evidence, beyond its own assertions, that its actions were reasonable. While the burden to prove that PBGC breached its duty ultimately lies with plaintiffs, PBGC has not provided sufficient evidence for the Court to conclude that, as a matter of law, it acted reasonably. Thus, neither side is entitled to summary judgment.

Most fundamentally, plaintiffs assert that the eight years PBGC took to finish issuing most of the determinations evidences that PBGC did not exert "expeditious and significant" efforts on their behalf, and therefore was itself a breach of the duty of care. (Pl.Mem.12.) They have presented little admissible evidence, however, that eight years was necessarily unreasonable in light of the multitude of complex tasks involved.[19] In any plan involving 39,000 participants, records verification and benefits determination is bound to take considerable time, and PBGC has

---

**19.** Plaintiffs have proffered the congressional testimony of Bonne Ann McHenry, an employee of one of PBGC's contractors, which supports their view of the deficiencies in PBGC's handling of the Plan. The testimony is inadmissible hearsay, however, and cannot be relied on to support plaintiffs' motion for summary judgment. *AD/SAT, Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 236 (2d Cir.1999).

presented evidence that Pan Am's records were in such bad shape that several audits and document-finding trips were necessary. (Madron Aff. ¶¶ 7, 13.) Completing the final compilation of all Plan documents took until 1998, and involved multiple trips to New York, New Jersey, and Florida, to gather Plan documents that were scattered during the bankruptcy proceedings. (*Id.* ¶¶ 8, 13.) PBGC also had to recover the Plan's assets, and did not receive a bankruptcy settlement until November 1994. (Def. R. 56.1 Statement ¶ 29.) Its contractors also ran into problems ascertaining information regarding the participants, as these records were apparently incomplete and inaccurate, and had to be completely audited. (*Id.* ¶¶ 17, 18, 20.)

Plaintiffs cite an evaluation report by the Office of the Inspector General, entitled "The Length of Time It Has Taken PBGC To Issue Initial Determination Letters," which states that across all of its cases (not the Pan Am Plan in particular), PBGC issues the majority of BDLs more than five years after a plan's termination date. (Katz Aff. Ex. 26 at 2.) Contrary to plaintiffs' assertions, however, the report is not especially critical of PBGC's practices, makes no finding that the length of time is unreasonable, and certainly does not accuse PBGC of negligence. Moreover, even if the report did attribute processing times to fault on PBGC's part, such a conclusion would not be terribly probative of PBGC's fault in this particular instance, as the report is based on a study of 60 plans, one of which may or may not have been the Pan Am plan. The fact that PBGC protested that the sample was not representative of its current work (*id.* app. 2) raises further questions about the reliability of the report with respect to PBGC's calculation of benefits under this Plan in particular.[20] Thus, the report does not

strongly support plaintiffs' claim that the length of time taken was unreasonable.

Plaintiffs also rely on the testimony of Joseph Grant, PBGC's deputy executive director, that PBGC was not prepared to issue BDLs "in as prompt a fashion as [he] would believe to be ideal." (Grant Dep. at 49.) He also testified, however, that he believed that PBGC had issued the BDLs in a reasonable time period, given the circumstances. (*Id.* at 50.) While in "ideal" circumstances, PBGC would have completed benefit determinations much more quickly, the state of the Plan's administration was, according to Grant and LaPiana (*id.*; LaPiana Aff. ¶¶ 19–20), hardly ideal as of the date of termination, and the operative question is whether PBGC acted reasonably in light of assertedly unfavorable circumstances. Thus, although the reasonableness of the length of time PBGC took to issue BDLs is ultimately a question for the factfinder at trial, since it requires weighing the evidence, some of it disputed, and characterizing PBGC's conduct in light of its duties, plaintiffs have presented little evidence that PBGC could have or should have completed the process more quickly.

Plaintiffs also allege that certain actions taken, or decisions made, by PBGC were in themselves unreasonable. First, they contend that PBGC inadequately staffed the Plan, because it maintained between three and six PBGC employees on the Plan at all times, in addition to its contractors. (Pl.Mem.12–13.) Once again, there is little to support an inference that this apportionment of staff was objectively unreasonable, even in light of the length of time that elapsed, given the constraints on PBGC as an agency, its responsibilities as trustee for other plans, and the assistance that it received from contractors. While Grant testified that "the agency was not

---

**20.** For the same reason, the report's finding that some of PBGC's participant information

was unreliable is not probative with respect to Pan Am Plan data.

prepared to deal with [the] workload" imposed by the Plan's termination (Grant Dep. at 48), he subsequently clarified his statement, saying that "the agency was not prepared to issue benefit determination letters in as timely a manner as I believe would be ideal." (*Id.* at 50.) Although it is possible that, given the increasing evidence of the Plan's disarray, PBGC's failure to devote more employees to the project may have become unreasonable at some point, PBGC's conduct must be evaluated in light of its trusteeship of, and obligations to, multiple plans, as well as its budgetary constraints.

Plaintiffs also argue that PBGC's contractors were carelessly selected and poorly monitored. (Pl.Mem.16–17.) "Failure to utilize due care in selecting and monitoring a fund's service providers constitutes a breach of a trustee's fiduciary duty." *Liss v. Smith*, 991 F.Supp. 278, 300 (S.D.N.Y.1998).[21] Thus, to the extent possible under the circumstances, PBGC was obligated to consider the Plan's needs, solicit competing proposals, evaluate them with due care, and select the one that could best serve the Plan's needs within budgetary constraints. *Id.* In July 1992, shortly after the Plan was decreed terminated, PBGC chose Office Specialists to collect Plan data and administer the Plan, without using a bidding process. PBGC justified the expedited procedure, authorized by federal regulations, by citing the tremendous workload created by the Plan and other exigent circumstances, as well as PBGC's history of working with Office Specialists and its experience with benefits administration.[22] (Katz Aff. Ex. 33.) Because the trustee of a terminated plan may

be faced with the need to calculate benefits quickly—which may better serve the interests of participants than a more leisurely selection of contractors—the expedited procedure may well have been reasonable under the circumstances, unless plaintiffs can establish that PBGC failed to use due care. Plaintiffs have not proffered any such specific evidence.

PBGC's selection of IMRG to replace Office Specialists may have violated its duty of care, however. As discussed above, Hagans's conflict of interest may have prevented PBGC from considering other contractors and the Plan's interests. By 1997, PBGC had no need to select a contractor without using a bidding process, as it had already been serving as trustee for the Plan for six years, and so its failure to consider different options in light of participants' interests could be a breach of its duty of care.

Plaintiffs also contend that PBGC's contractors performed badly. As trustee, PBGC had "an ongoing obligation to monitor the . . . services provided by service providers with whom [it had] an agreement, to ensure that renewal of such agreements is in the best interest" of the Plan. *Liss*, 991 F.Supp. at 300. There is some evidence that Office Specialists' performance was deficient, especially after PBGC moved its office to Atlanta, where the office was plagued by high turnover, telephone backlogs, and, of course, the BDL backlog. (Katz Aff. Ex. 39.) Indeed, Office Specialists' performance issues led PBGC to decide not to renew its contract in 1998. (*Id.*) Plaintiffs' only evidence of these issues is contained in the

---

**21.** While *Liss* involved an ongoing plan, there is no reason that the fiduciary duties it describes should not apply to trustees of terminated plans as well, since actuarial contractors fulfill the same functions, and are of equal importance, with respect to both types of plans.

**22.** Although plaintiffs assert that Office Specialists had no previous benefits experience (Pl.Mem.16), they have not proffered any evidence to this effect.

GAO report on Hagans's improper influence on the IMRG contract, but determining whether PBGC's renewal of the Office Specialists contract up until 1998 was reasonable will require more specific evidence as to the nature of its performance issues and when they arose.[23]

Plaintiffs have presented some evidence that PBGC failed to act with due diligence in administering the Plan, and thus defendant is not entitled to summary judgment. Plaintiffs have the burden of establishing that PBGC breached its duty, however, and it would be difficult for a reasonable factfinder to conclude, on the record as it exists now, that PBGC's actions were objectively unreasonable in light of its many responsibilities and constraints.

### 3. *Appropriate Equitable Relief*

Even if plaintiffs are able to establish that PBGC breached its duties of care and loyalty, it is unclear whether they would be entitled to any meaningful relief under ERISA. Section 1303(f) provides that courts may grant "appropriate equitable relief" to remedy fiduciary breaches by PBGC. Plaintiffs seek, in part, the removal of PBGC as trustee and the appointment of a private trustee (Am.Compl.¶ 83), but such relief is to be granted only in extreme circumstances, in cases involving "repeated or substantial violations of [the trustee's] responsibilities." S.Rep. No. 93-383, 1974 USCCAN at 4989. The evidence that plaintiffs have presented in support of their motion does not suggest that PBGC has repeatedly or substantially violated its duties. Even if it had, however, removal is almost certainly not appropriate at this point. PBGC has completed all but a few BDLs and appeals, and the expense and logistical problems involved in appointing a

new trustee far outweigh any practical benefit that the replacement would have for Plan participants and for plaintiffs in particular. Most of plaintiffs' extremely limited evidence of dereliction on the part of PBGC relates to actions taken in the 1990s and fails to suggest that the trustee continues to fall short of meeting its obligations of due care and loyalty today. While removing PBGC and appointing a new trustee may have been a viable option when plaintiffs first filed this suit in 1996, the passage of time and PBGC's subsequent actions to fulfill its duties have eroded the value of that remedy.

### C. *Inaccurate Benefit Calculations*

Plaintiffs argue that several of PBGC's decisions as to whether to give effect to certain Plan documents, practices, and data were in error, and resulted in plaintiffs' receiving lower benefits than they were entitled to under the assertedly correct interpretation of the Plan and its data. (Pl.Mem.20–23.) First, the parties disagree on whether Amendment 1984–1, which froze the accrual of benefits on December 31, 1983, was validly adopted. (*Id.* at 10.) Second, plaintiffs claim that PBGC failed to adequately investigate their claims that Pan Am maintained a practice of granting full subsidized early retirement benefits to participants who were not eligible for such benefits under the Plan, as long as they did not voluntarily end their employment, and that it consequently failed to interpret this part of the Plan correctly. (*Id.* at 21.) Third, PBGC refused to review its calculations in light of salary data discovered in 2001, allegedly because it did not want to increase its liability as guarantor. (*Id.*) Finally, PBGC allegedly used the wrong actuarial reduc-

---

**23.** Plaintiffs also cite another GAO report from 2000, entitled "Contract Management Needs Improvement" (Katz Aff. Ex. 40), but the statements in this report do not directly pertain to PBGC's management of the Pan Am contracts in particular, and so plaintiffs cannot rely on this report as evidence of PBGC's conduct with respect to the Plan.

tion factors in calculating plaintiffs' benefits, and refused to review its calculations when the error came to light. (*Id.* at 23–24.)

In reconstructing the set of documents that constituted the Plan, PBGC acted in its capacity as trustee, and so its wrongful refusal to give effect to a portion of the Plan may be the basis of a claim for breach of fiduciary duty. While PBGC argues that plaintiffs may not base a fiduciary duty claim on allegations that it incorrectly calculated their benefits, because the substance of this claim is similar to one that would be made on direct review of PBGC's benefit calculations (Def.Opp. 1, 17), § 1303(f) provides a broad right of action for any plan participant who is "adversely affected" by any action taken by PBGC. In *Varity Corp. v. Howe,* 516 U.S. 489, 513–14, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Supreme Court interpreted a similarly broadly worded provision in Title I to provide a "catch-all" right of action for breach of fiduciary duty based on the denial of benefits to plan participants who could not avail themselves of Title I's more specific remedies. In concluding that courts should be allowed to fashion "appropriate equitable relief" for participants who have been denied benefits as a result of a fiduciary's breach of duty, the Court relied on ERISA's policy of providing relief to participants based on fiduciary breaches, as well as on the fact that a fiduciary's duty arising from the discretionary function of interpreting the plan, *see* 29 U.S.C. § 1002(21), is co-extensive with, and reviewed under the same standard as, its authority to construe plan documents. *Varity Corp.,* 516. U.S. at 514–15. Because § 1303(f) does not provide various specific remedies for different types of fiduciary conduct, but simply provides a broad right of action that is not explicitly limited according to the substance of a participant's claim, there is no reason that plaintiffs cannot frame their claim as in-volving PBGC's breach of its fiduciary duties of care and loyalty in interpreting Plan documents, even though they could, in theory, bring a separate action to appeal the denial of their benefits. *Cf. Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 89 (2d Cir.2001) (holding that, in the context of Title I, *Varity Corp.* "did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available").

As trustee, PBGC had the power "to do any act authorized by the plan ... to be done by the plan administrator," 29 U.S.C. § 1342(d)(1)(A)(i), including the power to "construe the Plan and to determine all questions of fact that may arise thereunder," (Katz Aff. Ex. 10 at VII–2). Determining which documents were validly enacted according to their terms, and which were unreliable or disregarded by the Pan Am Plan administrator, are responsibilities encompassed within PBGC's power to interpret the Plan and determine relevant questions of fact. Because the Plan gives PBGC the discretionary power to construe the Plan, its decisions in this regard cannot be overturned unless they were arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (holding that plan fiduciary is entitled to deferential review if empowered by the plan to construe its terms in order to determine benefit eligibility); *Varity,* 516 U.S. at 514–15, 116 S.Ct. 1065 (stating that the standard of review is the same for claims involving discretionary denials of benefits and those involving breaches of fiduciary duty). This deferential review is given even to the determinations made by PBGC in its capacity as trustee of a terminated plan, as long as the plan administrator would have been entitled to such review had the plan not been terminated. *Dycus,* 133 F.3d at 1369 (finding that PBGC's authority, and therefore its entitlement to

arbitrary and capricious review, was equivalent to the plan administrator's).

Under this standard, in order to withstand defendant's motion for summary judgment, plaintiffs must demonstrate a genuine issue of material fact suggesting that PBGC's determinations were arbitrary and capricious. *Jiras v. Pension Plan Make–Up Artist and Hairstylists Local 798*, 170 F.3d 162, 166 (2d Cir.1999). The Court must uphold PBGC's decisions unless it was not based on "consideration of the relevant factors" or reflects a clear error in judgment. *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir.1995); *Armstrong v. Liberty Mutual Life Assurance Co. of Boston*, 273 F.Supp.2d 395 (S.D.N.Y.2003). Moreover, "[w]here both the [trustee] and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the [trustee's] interpretation must be allowed to control." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92–93 (2d Cir.2000).

### 1. *Amendment 1984–1*

In 1984, Pan Am's Pension Committee adopted Amendment 1984–1, which froze the accrual of pension benefits after December 31, 1983. Because Pan Am's financial condition had led it to seek several waivers of ERISA's minimum funding requirements, the IRS had conditioned the grant of further minimum funding waivers on Pan Am's freezing benefit accrual. (Am. Compl. ¶¶ 25–28; Pl.Mem.10; Def. Opp. 18–19.)[24] Amendment 1984–1's adoption was expressly conditioned on the IRS's determination that it would not "adversely affect the status of the Plan as a qualified plan" under the Internal Revenue Code, or on the written waiver of the need for this determination.[25] (Katz Aff. Ex. 15 ¶ 16.) The Amendment was signed and adopted on August 10, 1984, but plaintiffs allege that PBGC has not produced any of the original documentation of either the IRS approval or the waiver of the condition. Plaintiffs now argue that, because PBGC has not substantiated its conclusion that the Amendment became part of the Plan, the Amendment was never validly adopted and PBGC violated its fiduciary duty in giving effect to the Amendment's benefits freeze. (Pl.Mem.10.)

Neither plaintiffs nor PBGC has provided the Court with any documentary evidence on this issue, although PBGC's Appeals Board represented to plaintiffs that the Amendment had been validly approved by the IRS by letter dated August 10, 1984, and that evidence thereof was sent to plaintiffs' counsel on March 30, 1998.[26] (Def. Ex. 58 at 11). The circumstantial evidence on which PBGC relied in determining the validity of the Amendment is undisputed, however. The IRS conditioned further minimum funding waivers on the adoption of the Amendment, and after its purported adoption, apparently granted subsequent funding waivers. (Am. Compl. ¶ 28; Pl. Mem. 10.) The Pan Am Pension Committee itself considered the Amendment validly adopted, as it argued to the court in the Plan termination proceeding that "additional benefits have long since ceased to accrue under these plans." *In re Pan Am. World Airways*, 777 F.Supp. at 1184. Plaintiffs do not dispute these facts, or PBGC's apparent

---

**24.** While neither side has proffered the funding waivers or any correspondence with the IRS, this version of events is apparently undisputed, so Court will take the allegations in the Amended Complaint as true.

**25.** It is not clear from the text of the Amendment who would have the power to waive the condition. Presumably, the Amendment is referring to either the IRS or the plan administrator.

**26.** Plaintiffs have not contested this assertion.

verification of the IRS approval (Def. Ex. 58 at 11), and have not proffered any evidence suggesting that the Amendment was not in fact adopted. Thus, plaintiffs have not raised an issue of fact as to whether PBGC acted arbitrarily and capriciously in considering the Amendment part of the Plan.[27]

## 2. *Eligibility for Subsidized Early Retirement Benefits*

■ Plaintiffs also argue that PBGC incorrectly interpreted the Plan's eligibility requirements for subsidized early retirement benefits, and wrongfully refused to give effect to an alleged Pan Am practice of providing these benefits to employees whose employment ended before they were old enough to be entitled to the full subsidy. The Summary Plan Description ("SPD") states that "[i]f you terminate your employment before age 55 ... the full actuarial reduction factors apply" (Katz Aff. Ex. 12 at 15), which PBGC interpreted as providing subsidized benefits only to those who had reached the age of 55 and had worked for Pan Am for at least 10 years at the time they left their employment. (Def.Ex. 51.) Plaintiffs argue that this provision did not apply to employees who, like plaintiffs, were involuntarily terminated after their benefits had vested but before they had reached the age of 55, because its use of the active voice ("if you terminate") implies that only voluntary termination triggered the "full actuarial reduction factors." (Pl.Mem.8, 21.)

PBGC's interpretation of the SPD's language was reasonable, and therefore must be upheld. *Pulvers,* 210 F.3d at 92–93. PBGC interpreted "if you terminate your employment" to include involuntary terminations, because the Plan itself defines "termination of employment" in terms of the different benefit statuses created by the timing of the termination, not in terms of voluntary and involuntary methods of ending one's employment. (Katz Aff. Ex. 10, Art. III.) The Plan also defines different entitlements with respect to when an employee "terminates employment," always using the active voice, and again not distinguishing between voluntary and involuntary termination. (*Id.* Art. IV.A.) When read in light of the Plan's provisions, the SPD's language indicates that any cessation of employment before age 55 disqualifies a participant from receiving subsidized benefits.

Plaintiffs contend that PBGC wrongfully disregarded the evidence plaintiffs presented to it, in the form of affirmations from union officials (*id.* Ex. 45), that Pan Am would accommodate certain terminated employees by re-hiring them for short durations once they reached age 55, in order to make them eligible for the subsidized benefits. (Pl.Mem.21.) Although plaintiffs assert that PBGC's only consideration of the issue was to calculate how much it would cost to provide fully subsidized early retirement benefits (*id.;* Katz Aff. Ex. 48), it is clear that PBGC did evaluate the merits of plaintiffs' evidence. PBGC considered the affirmations as evidence of Pan Am's interpretation of the Plan's language (Def.Ex. 51), but ultimately decided not to credit them, because of

---

27. Plaintiffs also assert that, even if PBGC was correct in giving effect to the Amendment, it wrongly "failed to follow the IRS requirement that all participants become fully vested in their pension benefits as a result" of a benefits freeze. (Pl.Mem.23.) They have provided, however, absolutely no evidence of the IRS rule itself or of any specific action or benefit determination that ignored the requirement. Moreover, insofar as this claim raises the rights of participants who received an allegedly incorrect determination that their pension rights had not vested, plaintiffs may not assert it, as their rights had vested at the time of their termination. *See* 29 U.S.C. § 1303(f).

the general nature of the assertions, the lack of any documentary evidence in collective bargaining agreements, and plaintiffs' inability to produce participants who had benefitted from the alleged practice, except for two individuals whose cases PBGC considered unrepresentative. (*Id.*) Plaintiffs have proffered no evidence suggesting that this conclusion was irrational or a clear error, or that PBGC was motivated by its desire to limit its liability.

In addition, PBGC concluded that, if it were to credit the affirmations, their assertions as to Pan Am's practices would actually support PBGC's interpretation of the Plan and the SPD. (*Id.*) This conclusion too was reasonable. Pan Am's alleged practice of rehiring laid-off employees for a few days after they had reached age 55, in order to make them eligible for benefits (Katz Aff. Ex. 45), establishes that Pan Am in fact interpreted its Plan as requiring employees to have reached the age of 55 to receive subsidized benefits, regardless of how their employment ended. If the Plan provided the subsidized benefit to employees involuntarily terminated before age 55, there would have been no need to re-hire laid-off employees after that age to qualify them for benefits. Pan Am's generosity in accommodating laid-off employees to allow them to receive higher benefits was completely gratuitous, and could not have resulted in an obligation on Pan Am's part to employ this practice with every employee, or in a modification of the Plan's terms. *See Perreca v. Gluck*, 295 F.3d 215, 224–25 (2d Cir.2002) (holding that employer may not orally modify a pension plan, and citing 29 U.S.C. § 1102(a)(1), which provides that all plan terms must be in writing). Thus, PBGC's interpretation of the Plan's subsidized benefits requirements was completely rational in light of the evidence before it, and defendant is entitled to summary judgment on this theory.

### 3. *Information Contained in the Reference B Report*

■ Plaintiffs next contend that PBGC wrongfully disregarded salary information contained in a document known as the Reference B Report, and that this resulted in their receiving lower benefits. In 2001, after most BDLs had been issued, PBGC discovered the Reference B Report, which consisted of two binders listing pension earnings between 1975 and 1979. (Katz Aff. Ex. 49 at 2.) The information contained in the Report apparently would have changed the benefit calculations for "hundreds" of Plan participants. (*Id.* at 1.) Plaintiffs suggest that using the data would have resulted in awards of higher benefit amounts (Pl.Mem.21), but LaPiana testified that PBGC determined that participants' benefit amounts would mostly be decreased by the new figures (LaPiana Dep. II at 64). At any rate, despite its conclusion that at least one person's benefits went up (by roughly $8 a month) when the Report's data were used to calculate his benefits (Katz Aff. Ex. 49), PBGC did not revisit its calculations for other participants, assertedly because one of its contractors, Palmer and Cay, determined that the Report was not a "reliable" source of data (LaPiana Dep. II at 78). There is some evidence, however, that PBGC's Appeals Board believed that the Report was reliable, and the deputy manager of the actuarial services division told LaPiana that he too thought it was reliable. (*Id.* at 77–78; Katz Aff. Ex. 49 at 1.) In the face of this internal division, PBGC has proffered only LaPiana's testimony regarding Palmer and Cay's findings, rather than any more direct documentation, and has not explained why it decided to ignore its own Appeals Board. (Def. Ex. 12 at 64–69.) Thus, the reliability of both the Report and PBGC's decisionmaking process with respect to it remain in dispute.

PBGC's refusal to revisit benefit calculations, in light of its apparent knowledge that hundreds of calculations would change, could constitute a breach of its duty if it never determined the reliability of the Report, chose to disregard it without verifying it, or disregarded it in the face of evidence that it was reliable.[28] Indeed, an internal PBGC email contains a statement that could indicate, at the least, disregard for the effect that the Report data might have on benefit amounts:

> The [Reference B Report] contains new data on probably a few thousand [Plan participants], including Messrs. Brooks & Beaumont (not Pineiro). However, neither Brooks' nor Beaumont's benefits appears to change using the [Report], although probably hundreds of other ... participants' benefits do change.

(Katz Aff. Ex. 49 at 1.) A factfinder could interpret this statement as reflecting particular concern for the benefit calculations of plaintiffs because of this litigation, and, in light of PBGC's decision not to use the Report, a lack of concern for other participants' calculations. This, combined with the internal dispute over the reliability of the Report,[29] and PBGC's knowledge that its data could increase some participants' benefits, could lead a factfinder to conclude that PBGC breached its duties of care and loyalty by not revisiting its calculations in light of the new data.[30]

### 4. *The SPD's Actuarial Reduction Factors*

■ In calculating the benefits to which plaintiffs were entitled, PBGC used the actuarial reduction factors provided in the SPD to account for the fact that plaintiffs were terminated before the Plan's retirement age of 65. Thus, plaintiffs received 45.2% of the benefit amount to which they would have been entitled had they retired at 65. (Katz Aff. Ex. 12 at 14; Ex. 50; Pl. Mem. 23–24.) In 1998, PBGC's contractor, Milliman, determined that the Plan documents themselves contained different, more favorable actuarial reduction factors, which would have resulted in plaintiffs' receiving approximately 47.2% or 48.4% of their full benefits, and that Pan Am itself had apparently used these figures to calculate benefit amounts. (Katz Aff. Exs. 50, 51.) Milliman concluded that PBGC's source for actuarial reduction factors, the 1983 SPD, was "not drafted correctly" and did not reflect Pan Am's actual intention with respect to the correct percentages. (*Id.* Ex. 50.) This information was sent directly to PBGC's Appeals Board, which had apparently inquired about the factors while considering an appeal. The Appeals Board then asked LaPiana to explain why the Insurance Operations Department had used the SPD's factors in the first place, and to substantiate the department's conclusion that the SPD's factors were actually correct. (*Id.*) Although PBGC asserts that the department did so (Def. R. 56.1

---

**28.** Plaintiffs allege that PBGC refused to reconsider its calculations in light of the Report because it knew that doing so would increase its liability for guaranteed benefits and its administrative costs, (Pl. Mem. 24; LaPiana Dep. II at 67–68), but LaPiana denied this motivation (LaPiana Dep. II at 68), and plaintiffs have not proffered any non-speculative evidence of their theory.

**29.** If PBGC did determine, after consideration, that the Report was unreliable, that determination would have to be upheld unless

it was arbitrary and capricious. *Firestone*, 489 U.S. at 112–15, 109 S.Ct. 948.

**30.** However, if PBGC establishes that it adequately considered data in the Report with respect to plaintiffs' benefit amounts, plaintiffs would not have standing to assert that PBGC's failure to do so with respect to other participants constituted a breach of fiduciary duty, as they themselves would not be "adversely affected," 29 U.S.C. § 1303(f), by PBGC's actions.

Statement ¶ 56; Def. Opp. 19–20), it has proffered no evidence of the department's response to the Appeals Board or its reasoning, and has not explained why Milliman's report was disregarded.

Plaintiffs have raised issues of fact as to whether PBGC's use of the SPD's actuarial factors, and its adherence to them in the face of evidence that they were the result of "a scrivener's error" (Katz Aff. Ex. 51 at 5), was arbitrary and capricious. If PBGC did not examine the actual provisions of the Plan and ensure that they could be reconciled with the SPD before simply using the factors listed by the SPD, it may have failed to consider all relevant factors before deciding how to interpret the Plan. *Jordan,* 46 F.3d at 1271. In addition, its refusal to review its benefit calculations after its contractor concluded that PBGC's reading of the Plan was based on a typographical error, absent a reasoned determination that Milliman's report should be disregarded, could constitute an arbitrary refusal to ensure that its implementation of the Plan was in accordance with Plan provisions and Pan Am's intent in drafting them.

### 5. *Equitable Relief*

Even if plaintiffs are able to establish that PBGC breached its duty with respect to them, however, they may not be entitled to any meaningful equitable relief. The remedy that plaintiffs apparently seek for PBGC's alleged failure to calculate benefits based on the correct documents is "equitable restitution-based relief," assertedly modeled on the remedy of recovery of benefits that is provided to participants of ongoing plans in 29 U.S.C. § 1132(a)(1)(B). (Pl. Opp. 24; Brooks Dep. at 15–16.) [31] In other words, plaintiffs explicitly seek "monetary relief" (Pl.Opp. 24) that will compensate them for the undercalculation of their benefits. ERISA provides that the only remedy available to plan participants suing PBGC for breach of fiduciary duty is "appropriate equitable relief," 29 U.S.C. § 1303(f), and so plaintiffs' entitlement to an award of greater benefits hinges on whether such relief may be considered equitable rather than legal. [32]

Claims for back benefits and for future payment of specified benefit amounts, even if characterized as claims for restitution or injunctive relief, apparently seek "legal" relief that is not available under § 1303(f). *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (holding that plaintiffs seeking payments to which they are allegedly entitled under a pension plan are simply attempting to "impose personal liability on [defendants] for a contractual obligation to pay money"); *DePace v. Matsushita Elec. Corp. of Am.,* 257 F.Supp.2d 543, 561 (E.D.N.Y.2003) (disallowing claim for benefits allegedly withheld because of breach of fiduciary duty). [33] Thus, it ap-

---

**31.** Since the issue of remedies has not been briefed, the Court does not exclude the possibility that plaintiffs have other theories of equitable relief.

**32.** Although plaintiffs cite § 1132(a)(1)(B) in support of their claim for benefits, this section provides rights of action for participants of ongoing plans. Title IV provides its own right of action for participants asserting claims against fiduciaries of plans subject to termination, 29 U.S.C. § 1370, and against PBGC in its capacity as the plan's trustee, *id.* § 1303(f). Section 1303(f) provides plaintiffs'

exclusive remedy against PBGC as trustee, allowing plaintiffs to seek only "equitable relief," and, unlike § 1132(a)(1)(B), it does not provide a separate means by which plaintiffs can seek recovery of benefits.

**33.** Although the Supreme Court's decision involved the phrase "equitable relief" as contained in § 1132(a)(3), a right of action provided for fiduciary breaches involving ongoing plans, the Court's reasoning turned on the traditional lines of demarcation between legal and equitable relief rather than on the language of § 1132, its legislative history, or

pears that plaintiffs may not receive back benefits or future payments in an action brought under § 1303(f). If review under the Administrative Procedure Act is available, they might have more success bringing these claims on direct review of PBGC's benefits decisions, because the APA does not limit them to equitable relief.[34]

### D. Breach of the Duty To Disclose Information

Plaintiffs next allege that PBGC failed to disclose a variety of information that it was obligated to provide either sua sponte or on request, asserting that PBGC refused to provide Plan documents and data, in violation of 11 U.S.C. § 704(7), that its BDLs contained insufficient information, that it should have disclosed several of its interpretive decisions that affected the amount of benefits to which plaintiffs were entitled, and that it failed to provide regular updates on the status of the Plan.

While the trustee is clearly obligated to "furnish such information concerning the [plan] and [the plan's] administration as is requested by a party in interest," 11 U.S.C. § 704(7), the extent to which the trustee is subject to a duty to affirmatively disclose certain plan information, either spontaneously or within a BDL, is less clear. In the context of an ongoing plan, the Second Circuit has used principles of trust law to conclude that a fiduciary's general duties of care and loyalty include the duty to affirmatively disclose information in situations where the fiduciary has caused confusion, or where the participant is unaware of information that affects her transactions with the fiduciary. *See, e.g., Pocchia v. NYNEX Corp.,* 81 F.3d 275, 278 (2d Cir.1996); *Am. Medical Ass'n v. United Healthcare Corp.,* No. 00 Civ. 7246(LMM), 2001 WL 863561 (S.D.N.Y. July 31, 2001); *see also* 29 U.S.C. § 1133. Because Title IV trustees share with fiduciaries of ongoing plans the fiduciary duties of care and loyalty provided for in 29 U.S.C. § 1104, *see* 29 U.S.C. § 1342(d)(3), the principles of openness and fairness that are implicit within those general duties apply to Title IV trustees as well. At the same time, these duties must be applied, and their scope determined, in light of the fact that the functions of a Title IV trustee are often completely different from those of a Title I fiduciary, and the interests and needs of the participants are altered when the plan is subject to termination.

---

congressional purposes. *Great–West Life,* 534 U.S. at 212–17, 122 S.Ct. 708. Thus, there is no basis for concluding that the Court's holding is limited to § 1132, or that it does not apply equally to the "equitable relief" allowed by § 1303(f).

**34.** Section 702 of the APA provides a right of action for judicial review of any agency action. 5 U.S.C. § 702. Since PBGC's denial of benefits under a plan for which it serves as trustee constitutes agency action, it is possible that plaintiffs may use this right of action to challenge their benefit determinations, and if they prevail, may obtain a judgment that PBGC must pay them higher benefits. On the other hand, Congress's provision of a more detailed remedial scheme within a specific statute, such as ERISA, may preempt the APA's right of action. *Block v. North Dakota ex rel. Bd. of Univ., and School Lands,* 461 U.S. 273, 285, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). Arguably, § 1303(f)'s statement that "[t]his subsection shall be the exclusive means for bringing actions against [PBGC] under this subchapter," as well as its limitation on the available relief, indicates congressional intent to provide more circumscribed relief than is available under the APA, even in the context of direct review. If the APA were preempted by Title IV, § 1303(f) would be plaintiff's sole right of action, and they would then be limited to "appropriate equitable relief" even when appealing PBGC's denial of benefits.

1. *PBGC's Insistence that Plaintiffs Use FOIA To Obtain Information*

■ Plaintiffs allege that PBGC required individual beneficiaries to use FOIA's procedures to obtain their employment records and other pension information, when PBGC had a duty to provide this information on request, and at its own expense. (Am. Compl. ¶¶ 72–73; Pl. Mem. 41–43.) While Title IV provides that plan trustees must provide information relevant to the plan to participants on request, 11 U.S.C. § 704(7), FOIA is designed to ensure that any person, whether or not she has an interest in the matter at issue, may obtain public documents, as long as the information is not subject to a privilege. *Federal Open Mkt. Comm. of the Federal Reserve v. Merrill*, 443 U.S. 340, 351–52, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). The burden of this broad disclosure is placed on the person who requests the information; thus, agencies may charge for both the labor and materials involved in locating, collecting, and copying records. *See Pierce & Stevens Chem. Corp. v. U.S. Consumer Product Safety Comm'n*, 585 F.2d 1382, 1384 (2d Cir.1978); *see also* 5 U.S.C. § 552(a)(3), (a)(4)(A).

In *Pineiro III*, Judge Preska held, and this Court emphatically agrees, that the trustee's duty to provide information pursuant to 11 U.S.C. § 704(7) requires it to furnish requested plan information free of cost, and without insisting that participants comply with FOIA's procedures. *Pineiro III*, 2000 WL 282894, at *4. Because FOIA provides a procedure that permits persons to whom an agency owes no duty whatsoever to obtain information, "[t]here is no reason why access to such information should be made more burdensome to a plan participant for the sole reason that the trustee happens to be the PBGC." *Id.* Private trustees would have no choice but to provide information pursuant to § 704(7), so PBGC should not be able to take advantage of its status as an agency when it is acting as trustee by using FOIA to shift the burden of document production onto Plan participants.[35]

The scope of that duty is fairly extensive, as § 704(7) places the burden of providing requested information on the trustee, and reflects the "overriding duty ... to keep [parties in interest] informed." *In re Sports Accessories, Inc.*, 34 B.R. 80, 81–82 (Bankr.D.Md.1983). Courts have interpreted the trustee's responsibilities broadly, making "a request for information difficult for the trustee to avoid, in the absence of a court order to the contrary." *Id.* The duty applies only to information "concerning the [plan]" and its administration, 11 U.S.C. § 704(7), however, so the range of information covered by § 704(7) is narrower than that covered by FOIA, extending only to documents relating to the Plan itself, and actions that PBGC took as trustee in administering it. PBGC would therefore be entitled to require plaintiffs to use FOIA to obtain information about any actions that it took as guarantor, or actions that it took prior to being appointed trustee of the Plan.[36]

---

**35.** PBGC argues that FOIA must apply because Plan documents are "agency records" within the meaning of FOIA, 5 U.S.C. § 552(a)(3). (Def.Mem.39.) Nothing in FOIA itself, however, provides that FOIA is the exclusive procedure for obtaining agency records.

**36.** Plaintiffs, through their attorneys, apparently made a FOIA request for all documents relating to PBGC's decision to terminate the Plan, and its actions since becoming trustee, in 1995. They received all of the documents that they sought. *Pineiro I*, 1997 WL 739581, at *13. (Pineiro Dep. at 48; Beaumont Dep. at 76; Def. R. 56.1 Statement ¶¶ 67–72.) Plaintiffs have not proffered any evidence that they invoked § 704 in making this request, and were told to use FOIA; rather, they apparently chose to invoke FOIA. This was probably a strategic choice, given that PBGC would not be required to disclose material related to PBGC's decision to terminate the

Plaintiff Brooks testified that he requested his employment records and the documents that PBGC had used to calculate his benefits, in order to facilitate his appeal, and was told that he would have to use FOIA to obtain the information. (Brooks Dep. at 126–27.) These are records that clearly concern the Plan, and would be subject to § 704's disclosure requirement. Although plaintiffs assert that they made numerous requests like Brooks's, and PBGC refused to fulfill any of them except pursuant to FOIA (Pl. Mem.19–20), they have not provided evidence of any other requests. Both sides agree, however, that plaintiffs Pineiro and Beaumont made similar FOIA requests (Def. R. 56.1 Statement ¶¶ 73–74), and given that PBGC's consistent position with respect to all information requests was that FOIA superseded 11 U.S.C. § 706(7) (Def.Opp. 15), a reasonable factfinder could infer that Pineiro and Beaumont used FOIA because it was the only method to which PBGC would respond. Whatever the exact number of occasions involved, PBGC breached its duty to provide information each time that it required Plan participants to use FOIA to obtain their employment records and Plan documents.

Plaintiffs concede, however, that once FOIA was invoked, PBGC provided them with all the information that they requested (Pineiro Dep. at 48; Beaumont Dep. at 76), and they do not dispute PBGC's assertion that it did not charge any individual participants for the costs associated with producing the records (Def. Mem. 39 n. 18). While Title I provides statutory penalties for disclosure violations like these, *see* 29 U.S.C. § 1132(c), Title IV does not. Thus, the only relief available is equitable,

and it is unclear what if any equitable relief would be "appropriate" under § 1303(f), other than an order that, in the future, PBGC not insist that plan beneficiaries use FOIA.

### 2. *Failure to Disclose Information in BDLs*

Plaintiffs next assert that, when they finally received their BDLs, they contained insufficient information for plaintiffs to make an intelligent assessment of the accuracy of the calculations and of their rights going forward. Specifically, they allege that PBGC failed to alert them to the significance of the BDLs by neglecting to send them by certified mail; that the calculations included in the BDL were not understandable and did not allow plaintiffs to determine any grounds for appeal; and that the BDLs failed to include the documents and records to support the calculations. (Pl.Mem.48.) [37]

As discussed above, PBGC acts in its capacity as trustee when it issues benefit determinations and pays benefits (*see supra* Part III), and is therefore subject to fiduciary duties of care and loyalty in so doing. With respect to ongoing plans, ERISA supplements its general imposition of fiduciary duties with a specific requirement that administrators must "provide adequate notice in writing to any participant … whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). While Title IV places no such specific obligation on the trustee of terminated plans, the fiduciary duties created by ERISA are

---

Plan under § 704(7). Since plaintiffs have not specifically listed this request among the occasions on which PBGC required them to use FOIA, the Court will therefore treat plaintiffs' § 704 claim as not including the 1995 FOIA request.

**37.** Plaintiffs also assert that many BDLs contained factual inaccuracies (Pl.Mem.15–16, 19), but they have not provided any examples.

to be interpreted in light of, and supplemented by, the common law of trusts. *Varity Corp.*, 516 U.S. at 496, 116 S.Ct. 1065; *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C.Cir.1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA. At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary."). The trustee's general duties of care and loyalty include the principle that "[i]n dealing with the beneficiary on the trustee's own account ... he is under a duty to communicate to the beneficiary all material facts in connection with the transaction which the trustee knows or should know," Restatement (Second) of Trusts § 173, cmt. d, because otherwise the beneficiary would have no way of reviewing or challenging the trustee's actions. Nothing in Title IV, or in the unusual dual status of PBGC as a governmental body that is also a trustee, provides any reason to relieve PBGC of this fundamental obligation of trusteeship. Thus, although Title IV trustees have no explicit statutory duty to provide complete and understandable information in a BDL, its general fiduciary duties encompass the responsibility to ensure that plan participants are fully informed as to their transactions with the trustee.

 Plaintiffs' argument that PBGC breached its duty by sending the BDLs by regular mail is without merit. While plaintiffs argue that using certified mail would have more effectively informed them that the BDL was an important document, (Pl.Mem.15), the letter itself states:

> The Pension Benefit Guaranty Corporation ... used the pension plan's records and the information you provided to determine the amount of your PBGC bene-

fit. We have completed our review and determined that you are entitled to a monthly benefit provided by law of $332.74.... If you believe this determination is incorrect, you may appeal to the PBGC Appeals Board within 45 days of the date of this letter.

(Katz Aff. Ex. 22.) Thus, even a cursory examination of the contents of the letter is sufficient to ascertain its import and substance, and this is all that PBGC is required to provide. It cannot be expected to make allowances for those who might throw away their mail without reading it, or who do not have the patience to read correspondence that is clearly from the agency in charge of determining their pension benefits. Finally, plaintiffs have asserted that some participants may not have received their letters (Pl.Mem.48), but plaintiffs themselves obviously received theirs, and were able to appeal within the deadline.

 Plaintiffs' allegations that the BDLs did not provide understandable calculations and did not contain supporting Plan documents are best considered together, since both are claims that the BDLs, in the form used by PBGC, were incomprehensible. The trustee's duty to provide information related to the participant's transactions with the trustee extends to information that is necessary for the participant to challenge the trustee's actions, either through an internal appeal or in court. *Borowski v. Int'l Business Machines Corp.*, 978 F.Supp. 550, 557 (D.Vt.1997). Thus, fiduciaries may well be required to provide understandable calculations of benefit amounts, rather than simply disclosing the amount to which a participant is entitled, since it is the calculations, and the antecedent application of the plan provisions to the participant, that provide potential bases for challenge. *Cf. Proujansky v. Blau*, No. 92 Civ.

8700(CSH), 2001 WL 963958, at *10 (S.D.N.Y. Aug.22, 2001) (stating that plan administrator's duty under 29 U.S.C. § 1025(a) to make statements of participants' benefit entitlements is interpreted broadly to require the inclusion of supporting calculations).

■ Here, the BDLs list all of the factors and numerical values relevant to the calculations, show the calculations and their results, and provide extremely brief explanations of what the calculations mean. While the information particular to the participant (such as years of service and retirement age) is presumably verifiable by the participant, the numerical values that depend on the terms of the Plan are meaningless without reference to the Plan's terms. Thus, a reasonable factfinder could conclude that these calculations would be understandable (and therefore open to challenge) if the participant had a copy of explanatory Plan documents, such as the Summary Plan Description, to refer to, but are virtually incomprehensible without them. In recognition of this reality, 29 U.S.C. § 1133 and its supporting regulation, 29 C.F.R. § 2560.503-1, require administrators of ongoing plans to include plan documents with the notification of denial of benefits. This ensures that the recipient of the denial can ascertain whether she has grounds to challenge the determination. *See Alternative Care Systems v. Metropolitan Life Ins. Co.*, No. 92 Civ. 7208(RPP), 1996 WL 67737, at *2 (S.D.N.Y. Feb.16, 1996). It is undisputed, however, that PBGC did not enclose the SPD or any Plan documents in the BDL (*see* Def. R. 56.1 Statement ¶ 72), even though it would not be surprising if, nearly eight years after Pan Am's bankruptcy and the termination of all of its employees, many participants no longer retained their copies of Plan documents. Thus, participants such as plaintiffs, who wished to appeal their benefits determinations, were forced to ask PBGC to provide them with copies of Plan documents and to ask for repeated extensions of the appeals deadline while they waited for the documents. (Pl.Mem.15–16.) This process was particularly cumbersome in light of PBGC's insistence that plaintiffs use FOIA to obtain these documents, itself a violation of its disclosure obligations. A reasonable factfinder could conclude, therefore, that PBGC failed to fulfill its disclosure obligations by neglecting to include copies of any explanatory Plan documents in the BDLs, thereby impairing plaintiffs' ability to comprehend and challenge their benefit determinations.

Once again, it is unclear what if any remedy would be appropriate if such a breach were found. Since plaintiffs have chosen not to prosecute this case as a class action, their claim is based only on their own benefit determinations. All three plaintiffs have long since received their BDLs, appealed their determinations, and had their appeals denied. (Def.Exs.55–57.) They have not proffered any evidence suggesting that they will ever receive further BDLs from PBGC that could be affected by any equitable relief that the Court could grant. The parties will eventually have to address such issues as the litigation proceeds.

3. *Failure To Voluntarily Disclose Plan Documents and Data*

Finally, plaintiffs assert that PBGC breached its fiduciary duty by not affirmatively disclosing its decisionmaking process as to the verification and interpretation of Amendment 1984-1, the Reference B Report, and the early retirement actuarial reduction factors specified in the Plan documents and the SPD. (Pl.Mem.24, 47.) Thus, plaintiffs argue, PBGC had a duty to disclose "information concerning the failure of Pan Am to satisfy the conditions precedent for implementation" of Amend-

ment 1984–1, and also a duty to disclose the existence of the Reference B Report and the fact that the SPD's actuarial factors conflicted with those provided in the Plan, because of their potential effect on the amount of some participants' benefit awards. (*Id.*) PBGC had determined that Amendment 1984–1 was a valid part of the Plan and that the Reference B Report was not a reliable source of data, and had used the SPD's actuarial factors despite a conflict with other Plan documents. (Def. Opp. 18–19; Def. R. 56.1 Statement ¶ 57.) Thus, plaintiffs assert that PBGC was obligated to affirmatively inform participants that, if these determinations were incorrect, they could potentially be entitled to greater benefits.[38]

 While a fiduciary may not mislead participants about its decisionmaking processes, it does not have to affirmatively advise participants of every step in its internal deliberations, unless the fiduciary itself has created confusion as to the action being considered. *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 669 (2d Cir.1994); *see also Pocchia,* 81 F.3d at 278 (holding that employer had no obligation to voluntarily disclose deliberations regarding a plan amendment before it had actually been adopted, and noting burden on fiduciary and likelihood of confusion arising from overly stringent voluntary disclosure requirements). Any fiduciary making benefits determinations may be faced with any number of judgment calls that will affect benefit entitlements, but the fiduciary has no obligation to render that process completely transparent; rather, it simply must ensure that none of its words or actions could affirmatively mislead and participants. *Mullins,* 23 F.3d at 669. The statute does not contemplate ongoing, detailed

oversight of the plan's administration by participants and their lawyers, who do not have the trustee's command of the plan as a whole, or its specialized experience. ERISA's goal of allowing participants to oversee their plan's administration, *Pocchia,* 81 F.3d at 278, is adequately furthered by allowing participants who have reason to doubt the accuracy of the trustee's calculations to make broad requests for information.

 Plaintiffs have not established that PBGC misled them by not disclosing the process of verifying Amendment 1984–1, or even that there were doubts about the Amendment's validity to disclose. Plaintiffs already knew about the existence of the Amendment and the benefits freeze, because Pan Am had given effect to the Amendment, so there was no confusion as to whether plaintiffs would be entitled to benefits based on post–1983 salaries. (*See supra* Part IV.C.) Absent any evidence that PBGC did not act in good faith in giving effect to the Amendment, there is no reason to believe that its silence as to its decisionmaking process could have been misleading to plaintiffs.

 With respect to the Reference B Report and the early retirement actuarial reduction factors contained in the Plan, however, plaintiffs have proffered evidence that could suggest PBGC did not act with diligence and integrity in deciding not to recalculate benefits based on the Report's data and the evidence that the actuarial factors contained in the SPD were incorrect. (*Id.*) If PBGC knew that the Report was a reliable source of data, and that it could entitle hundreds of participants to larger benefits, but chose not to disclose that fact, then its silence on the matter

---

**38.** Plaintiffs also assert in their briefs that PBGC "failed to disclose that ... it gave effect to Amendment 1984–1," (Pl.Mem.10), but the basis for this assertion is not evident,

as the BDLs clearly indicate that the benefits freeze was used to calculate benefit amounts. (Katz Aff. Ex. 22.)

would be misleading. Similarly, PBGC's realization that some participants' benefits should have been reduced by a smaller factor according to Plan documents would render failure to disclose the new information misleading. PBGC's continuing to pay periodic benefits at a given amount is an implicit representation that that amount is correct to the best of its knowledge. Failing to indicate otherwise, when in possession of knowledge that the benefit amounts are not correct, would be equivalent to an affirmative misrepresentation. *Pocchia,* 81 F.3d at 278. Because PBGC's intent and knowledge with respect to these documents are questions of fact, neither side is entitled to summary judgment with respect to this theory of PBGC's failure to disclose information.

### 4. Failure To Provide Regular Updates on Plan Administration

■■■ Finally, plaintiffs argue that PBGC failed to provide them with regular updates regarding the status of Plan administration. (Pl.Mem.19–20.) In contrast to fiduciaries of ongoing plans, which are required by 29 U.S.C. § 1023(c) to provide annual reports on plan administration to all plan participants, Title IV trustees have no explicit statutory obligation to provide such updates. While plaintiffs argue that providing regular updates is also part of the trustee's general fiduciary duties under 29 U.S.C. § 1342(d)(3) (Pl. Mem.47), this argument overlooks the differences between administering an ongoing plan and trusteeing a terminated one. Because the purpose of the disclosure requirements that ERISA and the common law place on fiduciaries of ongoing plans is to "ensure that employees [would have] sufficient information and data to enable them to know whether the plan was financially sound and being administered as intended," *Pocchia,* 81 F.3d at 279 (internal quotation marks and citations omitted), there is no need for Title IV trustees to

provide regular administration updates. A plan subject to termination has no funds to invest, no investment future, and no benefits accruing, so the informational needs of participants in a terminated plan are therefore more focused than the needs of ongoing plan participants, involving only the trustee's reconstruction of the plan and interpretation of its terms, rather than the state of its assets and its long-term outlook. Participants in plans in the process of being terminated are adequately protected by the trustee's duty to provide information on request, and its duty not to mislead or confuse. Accordingly, PBGC is entitled to summary judgment on this aspect of plaintiffs' failure to disclose claim.

### E. Failure To Provide Reasonable Appeal Procedures

■■■ Plaintiffs argue that PBGC failed to provide a "reasonable period to appeal in light of the complexity of the calculations and other relevant circumstances in violation of the duty of loyalty." (Pl. Mem.48.) PBGC has promulgated regulations to govern its appeals procedures, which require that appeals must be filed within 45 days of the issuance of the BDL, and must contain a statement of the grounds for appeal and all relevant documents. 29 C.F.R. §§ 4003.52, 4003.54. Although plaintiffs assert that PBGC breached its fiduciary duty by providing such a short time in which to prepare and file appeals, *Pineiro III* held, and this Court agrees, that PBGC acts in its governmental capacity in establishing procedures for appeals. *Pineiro III,* 2000 WL 282894, at *4.

ERISA provides that participants in ongoing plans have the right to a "reasonable opportunity" to have adverse benefits decisions reviewed by the fiduciary. 29 U.S.C. § 1133(2). The statute provides no such right to appeal to participants in terminat-

ed plans, however, as no duty is placed on the trustee to establish internal review procedures. While the trustee may take any action within the power of the plan administrator, *id.* § 1342(d)(1)(A)(i), which could include establishing appeal procedures, there is nothing within Title IV that requires that the trustee do so.

The fact that PBGC has promulgated general regulations to govern administrative appeals indicates that it has acted in its governmental capacity. While it could have chosen to act in its capacity as trustee in providing appeals processes according to the terms of each plan for which it serves as trustee, PBGC instead decided to create regulations that would govern administrative appeals of all types, including appeals from clearly governmental or guarantor actions such as determinations that a plan is not covered under § 1321, *see* 29 C.F.R. § 4003.1(5). Thus, PBGC's creation of an appeals process is part of its governmental role, and it has no fiduciary duty to act solely in the interests of Plan participants in establishing its procedures. The amount of time that it has chosen to allow for filing appeals must be challenged, if at all, through the Administrative Procedure Act. Since as a matter of law, no fiduciary duties applies, PBGC is entitled to summary judgment on this claim.

### F. *Failure To Pay Survivorship Benefits*

 Plaintiffs assert that PBGC failed to pay survivorship benefits to spouses of deceased participants, in violation of ERISA's requirement that all plans pay survivorship benefits to spouses who have not explicitly waived their entitlement, and that it failed to notify eligible spouses of their entitlement. (Pl. Mem. 24–25; Pl. Reply 19.) They also allege that PBGC would condition such benefits, when it paid them, on the spouse's signing an agreement to repay the benefits if it were later discovered that she had waived them. (Pl.

Mem.24–25.) Plaintiffs do not have standing to assert these claims, however, because they have not personally been adversely affected by these actions. *See* 29 U.S.C. § 1303(f). All three plaintiffs were themselves participants in the Plan, not spouses of participants, and because they have elected not to prosecute this action as a class action, they cannot raise the rights of other participants' spouses when they themselves have not been injured.

### G. *Interference With Plaintiffs' Sources of Litigation Funding*

Finally, plaintiffs allege that PBGC's Executive Director, David Strauss, attempted to interfere with plaintiffs' source of litigation funding. (Pl.Mem.25.) Plaintiffs' legal expenses have been covered in part by their former union, the Transit Workers' Union of America. (*Id.*) According to a 1998 *New York Times* article, Strauss met with the union in order to "persuade [it] to stop financing the litigation" by asserting that the case did not have merit. (Katz Aff. Ex. 14.) The *Times* article itself cannot provide the factual basis for plaintiffs' allegations, however, as it is inadmissible hearsay. *In re Columbia Securities Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y.1994) ("News accounts, unsupported by corroborating evidence and offered to prove that certain statements were made" are inadmissible unless "bolstered by supporting evidence that confers some circumstantial guarantees of trustworthiness upon them."). Because the article constitutes plaintiffs' only evidence of the meeting and what transpired during it, and is not supported by any facts indicating its reliability, plaintiffs have not presented any admissible evidence that the meeting actually occurred of that the allegedly actionable statements were in fact made. Thus, PBGC is entitled to summary judgment on this claim. *AD/SAT, Division of Skylight, Inc. v. Associated*

*Press,* 181 F.3d 216, 236 (2d Cir.1999) (noting that party cannot rely on inadmissible hearsay in opposing a motion for summary judgment).

### V. *Plaintiff's Claim Under the APA To Compel Agency Action*

At Judge Preska's invitation in *Pineiro I,* 1997 WL 739581, at *10 n. 16, plaintiffs included in their Amended Complaint a claim under 5 U.S.C. § 706(1) to compel PBGC, insofar as it acted in its guarantor capacity, to issue BDLs, provide requested information, and to promptly conduct appeals. (Am.Compl.¶ 86.) This claim under the Administrative Procedure Act runs only against the PBGC in its agency capacity, and was intended to provide an alternative to plaintiffs' fiduciary duty claim, in the event that the Court found that PBGC acted as guarantor in calculating benefits.[39] Because plaintiffs have now established that PBGC acts in its trustee capacity in calculating benefits, issuing BDLs, and providing information, they may not maintain their § 706 claim on these grounds. PBGC does act in its governmental capacity in providing appeals from benefit determinations, but as plaintiffs have already appealed their benefit determinations and received decisions from the Appeals Board, there is no longer any agency action to compel as to them. PBGC is therefore entitled to summary judgment on plaintiffs' § 706(1) claim in its entirety.

### VI. *Future Proceedings*

While the discovery ordered by the Court of Appeals may not have shed much light on the legal issues that that Court declined to decide, it has somewhat simplified this litigation by disclosing that, even on the assumption that PBGC owed plaintiffs many of the fiduciary duties they assert, there is no evidence that PBGC breached those duties in a number of the ways charged by plaintiffs. Less beneficially, the period of delay involved in the lengthy and fruitless appeal, and in the resulting discovery process, has very likely effectively mooted many of plaintiffs' claims. The thrust of plaintiffs' original action was to demand that PBGC be compelled to act more quickly, or to face removal as trustee. Since this litigation has now outlived most of PBGC's functions as trustee, it is unclear what relief plaintiffs could receive, even if the remaining issues of fact were resolved in their favor. PBGC has essentially completed the process of calculating benefits under the Plan, and even of processing the appeals of Plan participants who objected to its determinations. Plaintiffs themselves have proceeded through the appeals process. It is not evident what if any future dealings they will have with the Plan trustee, or how they would benefit from even the drastic remedy of replacing the trustee, should they be able to establish breaches of fiduciary duty of the magnitude necessary to make such relief plausible.

Moreover, while plaintiffs are understandably frustrated by the slow pace and disappointing results of the benefit calculation process, they have provided very little evidence that these frustrations result from breaches of fiduciary duty by PBGC. Many of their claims have proven completely unsupported; others, while presenting issues of fact that cannot be resolved on summary judgment, will be difficult to establish at trial, given the limited evidence of malfeasance available to plaintiffs and the deferential standard of review applicable to several of the claims. Overall, plaintiffs have presented only the most

---

**39.** Plaintiffs have not made any independent claims against PBGC as guarantor by alleging that its calculations pursuant to 29 U.S.C. § 1322 were inaccurate or otherwise unlawful.

minimal case that the harm they have undoubtedly suffered resulted from anything other than the bankruptcy of their employer, the underfunding of the Plan, and the inevitable difficulties facing a government agency that inherits the task of administering a huge pension benefit plan that has collapsed along with the employer that once supported it.

It is for Congress to decide whether this tale represents a failure of the process it established to protect beneficiaries of underfunded plans, or a successful effort to salvage at least some guaranteed benefits from a situation that, before ERISA, might have deprived all the beneficiaries of any benefits at all. For its part, this Court must turn to the process of adjudicating the remaining claims of legal violations by PBGC. Given the complexity of trying the remaining claims, and the serious questions about what relief equity can plausibly provide to plaintiffs even if successful, the parties would be well advised to think carefully about ways of settling this long-running and potentially fruitless litigation.

## CONCLUSION

Plaintiff's motion for summary judgment is granted as to its claim for breach of fiduciary duty based on PBGC's insistence that plaintiffs use FOIA to obtain Plan-related information, and denied in all other respects. Defendant's motion for summary judgment is granted as to plaintiffs' claims based on (1) their allegations as to PBGC's inherently conflicted decisionmaking process; (2) PBGC's determinations with respect to Amendment 1984–1, vesting after the benefits freeze, and Pan Am's practice regarding subsidized early retirement benefits; (3) its failure to send BDLs by certified mail; (4) its failure to disclose its decisionmaking process with respect to Amendment 1984–1; (5) its failure to issue periodic administration updates; (6) its allegedly unreasonable procedural require-

ments for appealing BDLs; (7) its claimed misconduct with respect to survivorship benefits; and (8) its interference with litigation funding. Summary judgment for defendant is also granted as to plaintiffs' claim under § 706(1) of the APA. Defendant's motion is denied in all other respects.

SO ORDERED.